The **TROXEL MANUFACTURING COMPANY, Plaintiff-Appellee & Cross-Appellant,**

v.

**SCHWINN BICYCLE COMPANY, Defendant-Appellant & Cross-Appellee.**

**Nos. 72–1106, 72–1107.**

United States Court of Appeals,
Sixth Circuit.

Aug. 11, 1972.

———◆———

William E. Lucas, Horton, Davis, Mc-Caleb & Lucas, Chicago, Ill., Malcolm McCaleb and Malcolm McCaleb, Jr., Chicago, Ill., Walter P. Armstrong, Jr., Armstrong, Allen, Braden, Goodman, McBride & Prewitt, Memphis, Tenn., on brief, for appellant.

John R. Walker, III, Memphis, Tenn., George E. Morrow, Martin, Tate, Morrow & Marston, Memphis, Tenn., on brief, for appellee.

Stanton T. Lawrence, Jr., New York City, on brief; Sidney R. Bresnick, William C. Conner, Ronald F. Ball, New York City, of counsel, for New York Patent Law Ass'n, amici curiae.

American-Patent Law Ass'n, Arlington, Va., by Sidney Neuman, Pres., Chicago, Ill., on brief; George W. Whitney, New York City, John T. Roberts, Washington, D.C., Arthur H. Seidel, Milwaukee, Wis., of counsel, for American Patent Law Ass'n, amici curiae.

Patent Law Ass'n of Chicago, Richard L. Voit, President, Wolfe, Hubbard, Leydig, Voit & Osann, Ltd., Chicago, Ill., on brief, Victor P. Kayser, C. Lee Cook, Jr., Chadwell, Kayser, Ruggles, McGee, Hastings & McKinney, Chicago, Ill., Robert V. Jambor, Haight, Hofeldt & Davis, Chicago, Ill., of counsel, for Patent Law Ass'n of Chicago, amici curiae.

Cincinnati Patent Law Ass'n, Brief Writing Committee, Bruce Tittel, Chairman, Wood, Herron & Evans, Cincinnati, Ohio, Moses Lasky, San Francisco, Cal., on brief; Robert S. Daggett, Brobeck, Phleger & Harrison, San Francisco, Cal., of counsel, on brief, for Cincinnati Patent Law Ass'n, amici curiae.

Edward J. Brenner, Executive Director, Arlington, Va., for Association for Advancement of Invention & Innovation, amici curiae.

Before PHILLIPS, Chief Judge, and TUTTLE * and O'SULLIVAN, Senior Circuit Judges.

PHILLIPS, Chief Judge.

This is an appeal from a decision granting summary judgment to a patent licensee in an action for the recovery of royalties paid under the license agreement. The case requires an interpretation of Lear, Inc. v. Adkins, 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969). The opinion of the District Court is reported at 334 F.Supp. 1269. We reverse.[1]

Schwinn Bicycle Company is the assignee of a design patent for a bicycle seat issued to Frank Brilando in 1966. In mid-1967, following notice of infringement, Schwinn and Troxel Manufacturing Company entered into a nonexclusive license agreement under which Troxel was released from liability for past infringement and was licensed to manufacture and sell bicycle seats embodying the patented invention at an agreed per-unit royalty, payable quarterly. Schwinn obligated itself to enforce the patent against infringers.

Troxel notified Schwinn in August 1967 that Fisher Cycle Company was importing and selling infringing seats. Six months later Schwinn instituted an infringement action in the United States District Court for the Northern District of California against Goodyear Tire and Rubber Company, Fisher's vendee. The

---

* Honorable Elbert P. Tuttle, Senior Judge, United States Court of Appeals for the Fifth Circuit sitting by designation.

1. This court has been aided by amici curiae briefs which were not available to the District Court, filed by the American Patent Law Association, the New York Patent Law Association, the Patent Law Association of Chicago, the Cincinnati Patent Law Association, the Association for the Advancement of Invention and Innovation and Moses Lasky, Esq., an attorney of the San Francisco Bar. All of the amici briefs support the interpretation of Lear, Inc. v. Adkins, *supra*, adopted by this court in this opinion.

Brilando patent was held invalid in January 1969, on the grounds of anticipation and obviousness in view of a prior art seat which had been considered by the Patent Office in the course of examination of the Brilando application. Schwinn Bicycle Co. v. Goodyear Tire & Rubber Co., 160 U.S.P.Q. 587. Troxel thereupon informed Schwinn that royalties due under the license agreement would be escrowed pending appeal. Schwinn brought suit against Troxel to collect the escrowed royalties. Upon Troxel's payment of overdue royalties and agreement to continue making regular payments, Schwinn dismissed the suit. The decision of the California District Court was affirmed in December 1970, on the issue of obviousness. 444 F.2d 295 (9th Cir.). Schwinn thereupon notified its licensees that no royalties would be due for seats sold after the date of that decision.

Three months later Troxel filed this diversity action in the Western District of Tennessee, seeking recovery of all royalties paid under the agreement, or alternatively, those royalties paid subsequent to the District Court's holding of invalidity, together with interest from the dates of the respective payments, and a declaration that it had no liability for the payments due from sales during the last quarter of 1970. Schwinn counterclaimed for the unpaid final quarterly royalty payments. Troxel's motion for summary judgment, supported by affidavits showing the foregoing facts, was granted. Schwinn was ordered to refund all royalties with interest from the date of judgment. This appeal followed.

I.

It has been the established rule in this Circuit for nearly forty years that a final adjudication of invalidity of a licensed patent operates as an eviction from the license, terminating the licensee's obligation to continue making royalty payments after that date but giving no right to recoup royalties already paid. See Drackett Chem. Co. v. Chamberlain Co., 63 F.2d 853, 855 (6th Cir. 1933). In *Drackett* the patent was held invalid in a District Court decision which was not appealed. See 63 F.2d at 854. Absent a showing that Schwinn prosecuted its appeal to the Ninth Circuit in bad faith, the eviction in this case occurred on the date of the decision of the Court of Appeals. Cf. Scherr v. Difco Laboratories, Inc., 401 F.2d 443, 445 (6th Cir. 1968).

We are called upon in a case of first impression at the appellate level,[2] to consider the effect of the decision in Lear, Inc. v. Adkins, *supra*, 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969), on the eviction rule of this Circuit. The precise holding of *Lear* was that a licensee was not estopped to interpose the invalidity of the licensed patent as a defense to an action brought by the licensor to enforce the license agreement. See, 395 U.S. at 656, 671, 89 S.Ct. 1902. The District Court in the present case found that "the doctrine of *Lear* would . . . be equally applicable" to the case in which a licensee asserted invalidity offensively to recover royalties already paid. 334 F.Supp. at 1271. We believe this to be an unwarranted extension of *Lear*.

The abrogation of the licensee estoppel doctrine was the "decent public burial" of a "doctrine which ha[d] . . . been deprived of life." 395 U.S. at 667, 89 S.Ct. at 1909. The "clouded history" of the rule is discussed extensively in *Lear* and will not be repeated here. See *id*. at 663–668, 89 S.Ct. 1902. The Court reached its decision through extended consideration of the effect of federal patent-antitrust policy on traditional contract law concepts. The conflicting policies involved were placed in sharp focus:

"On the one hand, the law of contracts forbids a purchaser to repudi-

---

2. One District Court has reached a result squarely contrary to that of the District Court in the present case. See Rans- burg Electro-Coating Corp. v. Spiller & Spiller, Inc., 340 F.Supp. 1385, 1391–1392 (N.D.Ill.1972).

ate his promises simply because he later becomes dissatisfied with the bargain he has made. On the other hand, federal law requires that all ideas in general circulation be dedicated to the common good unless they are protected by a valid patent." Id. at 668, 89 S.Ct. at 1910 (footnote and citation omitted). Recognizing that it was seeking "an acceptable middle ground" which would "accommodate the competing demands of the common law of contracts and the federal law of patents," id., the Court found that:

"[T]he equities of the licensor do not weigh very heavily when they are balanced against the important public interest in permitting full and free competition in the use of ideas which are in reality a part of the public domain . . . that the technical requirements of contract doctrine must give way before the demands of the public interest in the typical situation involving the negotiation of a license after a patent has issued." Id. at 670–671, 89 S.Ct. at 1911.

As noted above, in Lear the federal policy in conflict with state contract law was "that all ideas in general circulation be dedicated to the common good unless they are protected by a valid patent." The development of this policy was set forth in Sears, Roebuck & Co. v. Stiffel Co., 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964), and Compco Corp. v. Day-Brite Lighting, Inc., 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964).[3] As noted by the Court:

"[I]n rewarding useful invention, the 'rights and welfare of the community must be fairly dealt with and effectually guarded.' To that end the prerequisites to obtaining a patent are strictly observed, and when the patent has issued the limitations on its exercise are equally strictly enforced. To begin with, a genuine 'invention'

or 'discovery' must be demonstrated 'lest in the constant demand for new appliances the heavy hand of tribute be laid on each slight technological advance in an art.' Once the patent issues, it is strictly construed, it cannot be used to secure any monopoly beyond that contained in the patent, the patentee's control over the product when it leaves his hands is sharply limited, and the patent monopoly may not be used in disregard of the antitrust laws, . . .

"Thus the patent system is one in which uniform federal standards are carefully used to promote invention while at the same time preserving free competition." Id. at 230–231, 84 S.Ct. at 788 (citations and footnote omitted).

This well developed resolution of the tension between the competing public interests reflected in federal antitrust and patent laws could "not be set at nought" by state law which clashed with its objective. Id. at 229, 84 S.Ct. 784.

Two terms following Lear, the traditional procedural "mutuality of estoppel doctrine" set forth in Triplett v. Lowell, 297 U.S. 638, 642, 56 S.Ct. 645, 647, 80 L.Ed. 949 (1936)—

"Neither reason nor authority supports the contention that an adjudication adverse to any or all the claims of a patent precludes another suit upon the same claims against a different defendant. While the earlier decision may by comity be given great weight in a later litigation and thus persuade the court to render a like decree, it is not res adjudicata and may not be pleaded as a defense."

—gave way to this public interest. In Blonder-Tongue, Inc. v. University of Illinois Foundation, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971), the Court held that a defendant in a patent infringement action could assert the defense of res judicata where the patent

---

3. Sears-Compco held that state unfair competition laws which prohibit mere copying of an unpatented or unpatentable article were void under the Supremacy Clause. See id. at 231, 237, 84 S.Ct. 784.

in suit had been adjudged invalid in litigation with a third party. The prior adjudication operated as a prima facie bar to recovery with the burden on the patent owner to demonstrate "that he did not have 'a fair opportunity procedurally, substantively and evidentially to pursue his claim the first time.'" *Id.* at 333, 91 S.Ct. at 1445 (citation omitted). The ruling was said to reflect the "consistent view . . . that the holder of a patent should not be insulated from the assertion of defenses." *Id.* at 349, 91 S.Ct. at 1453.

## II.

■ With this background we turn to the question of whether a license agreement voidable under *Lear* is void *ab initio,* entitling the licensee to recoup royalties already paid. In *Lear* the respective equities of licensee and licensor were balanced in light of the public interest. *See* 395 U.S. at 669–671, 89 S. Ct. 1902, 23 L.Ed.2d 610. As noted by the Court:

> "Licensees may often be the only individuals with enough economic incentive to challenge the patentability of an inventor's discovery. If they are muzzled, the public may continually be required to pay tribute, to would-be monopolists without need or justification." *Id.* at 670, 89 S.Ct. at 1911.

### A.

A rule that licensees can recover all royalties paid on a patent which later is held to be invalid would do far more than "unmuzzle" licensees. It would give the licensee the advantage of a "heads-I-win, tails-you-lose" option. *Lear* states that it is in the public interest to encourage an early adjudication of invalidity of patents. Application of the

holding of the District Court could defeat early adjudication of invalidity and encourage tardy and marginal litigation. If the licensee could recover royalties paid (subject to any statute of limitations) on the basis of an adjudication of invalidity accomplished by another litigant, without incurring the expense or trouble of litigation, there would be less inducement for him to challenge the patent and thus remove an invalid patent from the competitive scene. He would be more likely to wait for somebody else to battle the issue because he would have nothing to lose by the delay.

Rather than stimulating early litigation to test patent validity, such an interpretation of *Lear* would make it advantageous for a licensee to postpone litigation, enjoy the fruits of his licensing agreement, and sue for repayment of royalties near the end of the term of the patent. When a licensed patent is about to expire and the threat of injunction no longer exists, a licensee would have little to lose in bringing an action to recover all the money he has paid in royalties on the ground of the invalidity of the patent. The licensee would have a chance to regain all the royalties paid while never having been subjected to the risk of an injunction. Such an interpretation of *Lear* would defeat one of the expressed purposes of the court in announcing that decision.

### B.

■ Further, the interpretation of *Lear* adopted by the District Court inevitably would discourage the licensing of patents. A patent is a form of intellectual property. The licensing of patents is a business of considerable magnitude.[4]

Under the decision of the District Court, any person who has licensed his invention or patent would have a con-

4. The amicus brief of the American Patent Law Association contains this statement: "Studies show that about 27% of assigned patents (i. e. about 150,000) are put in use at least in part by licensing. Government figures show annual license fees for foreign patent rights to be over $700 million and for all patents to be $1,500 million." (Citing U. S. Department of Commerce Survey of Current Business, October 1971, at page 27).

tinuous cloud over any payment of royalties made to him. The cloud might take the form of limiting his credit because of contingent liability. He would be compelled to retain all royalties received in a relatively liquid state until the expiration of the licensed patent, or the running of the applicable statute of limitations. If the licensor should put royalties to work by investing them, a subsequent requirement of repayment could result in the sudden disruption of the investment. The royalties would be taxable to the licensor as ordinary income. *See* Fawick v. Commissioner of Internal Revenue, 436 F.2d 655 (6th Cir. 1971). Thus royalties from patent licenses, being currently taxable but not distributable as profits or usable to operate or expand a business, could constitute a burden on all except the largest and most wealthy licensors. It is entirely logical to anticipate that the owner of more than one patent would demand higher royalties for each in order to hedge against the possibility that royalties received under one patent might be returned to licensees.

### C.

An even more serious consequence of requiring royalty refunds with respect to patents held to be invalid is that it would deter inventors from resorting to the patent system in the first instance. The framers of the Constitution recognized the importance of promoting progress of science and the useful arts. (U. S. Constitution, Art. I, § 8, Cl. 8). They also recognized that it was important to encourage invention and the public disclosure of inventions to "add to the sum of useful knowledge." Graham v. John Deere Co., 383 U.S. 1, 6, 86 S.Ct. 684, 688, 15 L.Ed.2d 545 (1966).

■ Soon after making a discovery, an inventor must decide whether to protect his invention by a patent or to maintain it as a trade secret. It is public policy to encourage the disclosure and public use of ideas as opposed to the maintenance of trade secrets. The ex-clusive rights conferred by a patent grant are designed not only to encourage invention, but more importantly, to disclose the invention to the public. It is through disclosure that others will be given the opportunity to improve on the invention. If an inventor must face the possibility of refunding all patent royalties collected by him, he may be encouraged to keep secret an invention which otherwise might have been disclosed through the patent process.

### D.

It may be argued that the owner of a valid patent has nothing to fear from the result reached by the District Court—that it is only those whose patents are invalid who will feel the pinch. Unquestionably the public interest demands that developers of unpatentable inventions be deterred from acquiring or enforcing patent protection. However, Judge Learned Hand's observations on patentability should be kept in mind:

"That issue is a fugitive, impalpable, wayward, and vague a phantom as exists in the whole paraphernalia of legal concepts. It involves, or it should involve, as complete a reconstruction of the art that preceded it as is possible. The test of invention is the originality of the discovery, and discovery depends upon the mental act of conceiving the new combination, for substantially every invention is only a combination. Nothing is more illusory, as nothing is more common, than to assume that this can be measured objectively by the magnitude of the physical readjustments required. . . . When all is said, we are called upon imaginatively to project this act of discovery against a hypostatized average practitioner, acquainted with all that has been published and all that has been publicly sold. If there be an issue more troublesome, or more apt for litigation than this, we are not aware of it." Harries v. Air King Prod. Co., 183 F.2d 158, 162 (2d Cir. 1950).

### E.

We hold that *Lear* did not overrule Drackett Chem. Co. v. Chamberlain Co., 63 F.2d 853 (6th Cir. 1933), and that the rationale of *Drackett* remains the law of this Circuit except insofar as it expresses the licensee estoppel doctrine.

### III.

Troxel relies upon the following language of *Lear*: "For all these reasons, we hold that Lear must be permitted to avoid the payment of all royalties occurring after Adkins' 1960 patent issued if Lear can prove patent invalidity." 395 U.S. at 674, 89 S.Ct. at 1913. It is urged by Troxel that *Lear* said that payment of royalties on an invalid patent could be avoided from the time the patent issued, and not merely from the time the patent was declared to be invalid.

"It is a maxim, not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which these expressions are used." Cohens v. Virginia, 19 U.S. (6 Wheat) 264, 398, 5 L.Ed. 257 (1821) (Marshall, C. J.). Applying this maxim, we read the above-quoted language in *Lear* in the light of the facts that were before the Court in that case.

Lear had been denying liability for royalties during the entire life of the patent, the license agreement having been entered into before a patent issued. 395 U.S. at 657–658, 89 S.Ct. 1902. The license agreement called for royalties based upon the use of the alleged invention both before the patent issued and during the life of any patent which might issue. Prior to the issuance of the patent, Lear as licensee notified Adkins as licensor that it had found a patent which it believed fully anticipated Adkins' discovery. Lear terminated all payments under the agreement prior to the

issuance of the patent. 395 U.S. at 659–660, 89 S.Ct. 1902. The patent issued in 1960. No royalties were paid after issuance of the patent. Therefore, the above-quoted language of the Supreme Court must be construed in the light of the issue actually before the court, namely, that of licensee estoppel. We do not construe the decision of the Court, in overruling the doctrine of licensee estoppel, to require that a licensor should be compelled to repay all royalties received from its licensees under a license agreement where the patent subsequently is held to be invalid.

### IV.

In reaching its decision, the District Court relied upon principles of equity, saying: "We cannot, however, see why a licensee who has paid royalties should be in a worse position than one who has not. Moreover, the licensor who has to pay back royalties at least has had the use of the licensee's money."

To the contrary we conclude that the decision of the District Court reaches an inequitable result. Absent fraud or misconduct,[5] a patentee should not be held responsible for the issuance of an invalid patent. Patents are creations of Government, issued after examination by the United States Patent Office. This examination includes "a thorough investigation of the available prior art relating to the subject matter sought to be patented" and an evaluation of patentability by the patent examiner. See 37 C.F.R. § 1.104. Schwinn's patent was held invalid by the California District Court and by the Court of Appeals for the Ninth Circuit in view of such "available prior art." In these circumstances, once a patent has been declared invalid by a court, we do not consider it equitable to require the disenfranchised

---

5. It has been held, without reliance on *Lear*, that a licensee is entitled to recoupment of royalties paid when the licensed patent was procured fraudulently. *See* Nashau Corp. v. RCA Corp., 431 F.2d 220, 227 (1st Cir. 1970); SCM Corp. v. Radio Corp. of America, 318 F.Supp. 433, 470–472 (S.D.N.Y.1970); Schokbeton Prod. Corp. v. Exposaic Indus., Inc., 308 F.Supp. 1366 (N.D.Ga.1969). There is not the slightest suggestion in this record of any wrongful conduct by Schwinn in the procurement of the Brilando patent.

patentee to refund to all licensees all royalties that have been collected under licensing agreements prior to the adjudication of invalidity.

We hold that neither equity nor public policy require that Troxel be permitted to recover the royalties it paid to Schwinn. Before entering into the licensing agreement Troxel was provided with a copy of the Schwinn patent and had access to the file history of the prosecution of that patent before the Patent Office. Troxel could have challenged the patent initially instead of taking a license. It could have done so at any time after the license agreement was executed. It failed to take this action. It waited for someone else to challenge the patent. Even after another litigant had undertaken the challenge and had been successful at District Court level, Troxel did not join in that challenge but instead elected to remain a royalty-paying licensee. During all this time it had the benefit of freedom from suit for infringement and agreement of Schwinn to attempt to halt unlicensed infringers. It also enjoyed freedom from liability for past infringement.

Finally, on the licensee's side of the balance, the equities are less compelling than those in *Lear*. Typically, "any royalty payments [are] passed on to the consumers [and] are as a practical matter unrecoverable by those who in fact paid them." *Blonder-Tongue, supra,* 402 U.S. at 346, 91 S.Ct. at 1452.

### V.

The public interest is protected adequately under Lear without imposing on the patent holder the obligation to refund royalties paid under the license of a patent procured and asserted in good faith. A licensee may at any time cease royalty payments, secure in the knowledge that the invalidity of the patent may be urged when the licensor sues for unpaid royalties. *Lear, supra.* If the patent is declared invalid through the efforts and expenditures of another, no further royalties are due under the license agreement. Drackett Chem. Co. v. Chamberlain Co., *supra,* 63 F.2d 853. Further, if the evicted licensee is sued as an infringer, the prior adjudication of invalidity enables the licensee to secure pretrial judgment in his favor. *Blonder-Tongue, supra,* 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788. To permit a licensee in addition to recoup royalties paid is to extend *Lear* far beyond its rationale. Congress has not seen fit to create an implied warranty of validity in license agreements. We decline to do so by judicial action.

### VI.

■ The sole remaining issue is the disposition of Schwinn's counterclaim for royalties due for goods sold during the last quarter of 1970. *Lear* makes it clear that Troxel may defend against this counterclaim on the ground that the Brilando patent is invalid. Further, the Ninth Circuit ruling of invalidity is "available [as] an estoppel defense that can be pleaded affirmatively and determined on a pretrial motion for judgment on the pleadings or summary judgment." *Blonder-Tongue, supra,* 402 U.S. at 348, 91 S.Ct. at 1452.

Reversed and remanded with directions to dismiss Troxel's complaint and to make appropriate disposition of Schwinn's counterclaim.