**PRECISION SHOOTING EQUIPMENT, INC. and Paul E. Shepley, Jr., Plaintiffs, Bear Archery Co., Division of Victor United, Inc. and Ben Pearson Archery, Inc., Intervenors,**

v.

**HOLLESS W. ALLEN, INC., Defendants.**

**No. 77–0152–D.**

United States District Court, C. D. Illinois.

Feb. 8, 1980.

**80**

Jack E. Dominik, Miami, Fla., Thomas E. Harrington, Champaign, Ill., for plaintiffs.

John K. Roedel, Jr., St. Louis, Mo., Kennith W. Blan, Jr., Danville, Ill., for intervenors Ben Pearson.

William E. Pelton, New York City, John P. O'Rourke, Danville, Ill., for intervenors Bear Archery Co.

D. A. N. Chase, Kansas City, Mo., Harlan P. Huebner, Los Angeles, Cal., F. Daniel Welsch, Danville, Ill., for defendants.

### ORDER MODIFYING PREVIOUS ORDERS ESTABLISHING ROYALTY ESCROW FUND AND SUPPORTING MEMORANDUM OF LAW

BAKER, District Judge.

The plaintiffs have challenged the validity of a patent held by the defendants. In addition to a declaration that the patent is invalid, the plaintiffs seek to recover the royalties which have accrued under licensing agreements between the plaintiffs and the defendants.

By interlocutory orders the court directed that certain royalties be paid to the Clerk of Court and held in escrow until a final determination of the issue in the case.

### I

The case is once more before the court on motions to modify certain interlocutory orders. The plaintiffs seek to continue their payment of royalties into escrow while the defendants have moved that the escrowed royalties be released to them. The defendants, in conjunction with asserting claim to the escrowed royalties, also seek an order calling upon the plaintiffs to demonstrate in an evidentiary hearing that they can prove a *prima facie* case of fraud against the defendants. To know where we are and what the present posture of the case is, a review of the chronology of orders is necessary. For brevity and understanding, the plaintiffs Precision Shooting Equipment, Inc., and Paul E. Shepley, Jr. are referred to as Precision. The intervening plaintiff, Bear Archery Co., Division of Victor United, Inc., is referred to as Bear. The intervening plaintiff, Ben Pearson Archery, Inc., is referred to as Pearson. The defendants, Holless W. Allen and Allen Archery, Inc., are referred to as Allen.

Precision filed suit on August 15, 1977, challenging the validity of United States Letters Patent No. 3,486,495 which had been issued in 1969 to Allen. On May 2, 1978, Bear, one of Allen's licensees, sought leave to intervene as a plaintiff and challenge Allen's patent. On September 6, 1978, *nunc pro tunc* June 9, 1978, the court, (Morgan, C. J.) entered an interlocutory order which, after making findings of fact and conclusions of law, enjoined Allen from terminating the licensing agreement with Bear and from filing suit against Bear for the collection of royalties due under the licensing agreement. The order permitted Bear to pay into a court-held escrow fund both accrued but unpaid royalties, and royalties to become due in the future. The order also permitted Bear to continue to mark its product with the number of the challenged patent. The escrowed royalties were to be disbursed upon further order of the court.

Allen appealed from the September 6, 1978, order and prayed a dissolution of the temporary injunction and release of the escrowed royalties.

On November 28, 1978, another of Allen's licensees, Pearson, sought and was granted leave to intervene and challenge Allen's

patent. The court allowed Pearson to pay royalties that would accrue in the future into the escrow fund that had been established. However, the court directed Pearson to pay all royalties accrued to the date of Pearson's intervention directly to Allen. Pearson paid the accrued royalties to Allen and that aspect of the interlocutory orders is not in question here.

On April 2, 1979, Judge Morgan modified the interlocutory order of September 6, 1978. He modified the order after a limited remand by the Court of Appeals for the Seventh Circuit which afforded the district court "the opportunity to modify or amend" the September 6, 1978, order from which Allen had appealed. Judge Morgan concluded that the intent of the remand was to permit him to harmonize the Bear and Pearson orders as they applied to the escrow of royalties due under the licensing agreements between the plaintiffs and the defendants. Accordingly, Judge Morgan modified the escrow order as it applied to Bear but not to Pearson. The modification was worked by incorporating Allen's motion into the September 6, 1978, order by reference to that motion. The result was to direct the disbursement to Allen of all royalties then in escrow and to permit the payment into escrow of only those royalties which would accrue after Bear stopped marking its product with the patent number. Until Bear stopped marking its product, it was to pay royalties directly to Allen. In framing this amended order, the court expressly relied upon equitable principles announced in *Kraly v. National Distillers and Chemical Corp.*, 502 F.2d 1366, 1372 (7th Cir. 1974).

Bear appealed from the April 2, 1979, modifications. Allen cross appealed.

With the formation of the new Central District of Illinois, the case was moved from the court sitting in Peoria to the court sitting in Danville. After the case was reassigned, Bear sought a reconsideration of the April 2, 1979, order and applied to the Court of Appeals to remand the case. The Court of Appeals expanded the jurisdiction of the district court to reconsider the September 6, 1978, order, as amended.

On August 1, 1979, on reconsideration, the court vacated those portions of the April 2, 1979, order which permitted Allen to withdraw any royalties and continued in effect the escrow provisions of the September 6, 1978, order.[1] For convenience and ease of comprehension, a copy of the September 6, 1978, order with its additions and deletions, as it would have appeared just prior to August 1, 1979, is attached as Appendix "A".

## II

Allen now moves to amend the August 1, 1979, order by adding conclusions of law requiring an evidentiary hearing to determine whether Bear can prove a *prima facie* case of fraud by Allen in the procurement of the patent. Allen further seeks a stay of determination on the proper disposition of royalties which accrued before Bear filed suit until the evidentiary hearing is concluded.

This court based its August 1, 1979, order on the equitable conclusion that escrowing the royalties would safeguard the interests of all the parties and preserve the status quo. The decision to maintain the escrow account was founded upon two determinations made by Judge Morgan in his September 6, 1978, order. First:

If Bear prevails . . . it is reasonably likely that defendant Allen Archery, Inc. would be unable to repay such royalties.

As a result of this likely inability to recoup its royalties from defendant Allen Archery, Inc. in the event that a refund is ordered, Bear would be irreparably damaged if required to pay royalties directly to Allen Archery, Inc. and would have no

---

1. As noted in the August 1, 1979, order, the absence of the complete record hampered this court, which has now assembled copies of the initial order of September 6, 1978, the amending order of April 2, 1979, and the Allen motion of January 10, 1979, that Judge Morgan incorporated by reference into his amending order.

remedy at law with respect to recoupment thereof.

. . . . . .

Second:

> In view of the fact that some of the claims of the patent in suit have been disclaimed and since the validity of the patent is being challenged by other compound bow manufacturers in other United States District Courts, there is a reasonable likelihood of success by Bear in its declaratory judgment action . . . .

Thus, Judge Morgan found a demonstrated inability to repay on the part of the licensor should the licensee ultimately become entitled to recover the royalties, coupled with a reasonable likelihood of success by the licensee in its challenge suit.

■ Undoubtedly, a royalty escrow arrangement is permissible under appropriate circumstances. The inability of the patentee to repay royalties to which the licensee would become entitled is such a circumstance. *USM Corp. v. Standard Pressed Steel Co.*, 524 F.2d 1097, 1099–1100 (7th Cir. 1975); *Atlas Chemical Industries, Inc. v. Moraine Products*, 509 F.2d 1, 7 (6th Cir. 1974) (terming escrow "a commendable procedure to preserve the status quo during the course of [patent] litigation"); *Warner-Jenkinson Co. v. Allied Chemical Corp.*, 567 F.2d 184, 188–89 (2d Cir. 1977); *Milton Roy Co. v. Bausch & Lomb Inc.*, D.C., 418 F.Supp. 975 (D.Del.1976); *but see Nebraska Engineering Corp. v. Shivvers*, 557 F.2d 1257 (8th Cir. 1977). The court concludes that escrowing royalties is an appropriate interim provision under the circumstances of this case.

The next and the truly troublesome question is: What royalties are recoverable from a patentee whose patent is declared invalid? That question must be answered in this case in order to determine what royalties may rightfully be escrowed.

Consideration of royalties within the concept of the time at which they accrue affords a means of analysis. Five possibilities present themselves.

1. The "*ab initio*" rule. All royalties paid since the issuance of the patent may be recovered.

2. The "possession" rule. All royalties retained by the licensee and withheld from the patentee may be recovered.

3. The "challenge" rule. All royalties which accrue or are paid to the patentee after formal, legal challenge may be recovered.

4. The "renunciation" rule. All royalties which accrue after the licensee stops marking its product with the patent number and renounces the license may be recovered.

5. The "eviction" rule. All royalties which accrue after a final judgment of invalidity of the patent may be withheld or recovered.

Examination of the authorities dealing with suits to declare patents invalid and consideration of the policies underlying those decisions leads to the conclusion that the "challenge" rule is supported by the strongest rationale and generally should be applied. Bear's argument that the "*ab initio*" rule should apply where fraud on the Patent Office is the basis of invalidity is not persuasive. While equity might find an exception based on unjust enrichment where the fraud was worked directly on the licensee, no such claim has been raised here.

### III

The United States Supreme Court decision in *Lear, Inc. v. Adkins*, 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969) marks a point of departure in the field of patent litigation. In its narrowest sense, *Lear* overturned the doctrine of licensee estoppel. That doctrine held that a licensee who had obtained the benefits of a licensing agreement was estopped to contest the validity of the underlying patent. The doctrine would arise to prohibit a defense of patent invalidity in a suit by a patentee against a licensee for overdue royalties, *e. g., Automatic Radio Manufacturing Co., Inc. v. Hazeltine Research, Inc.*, 339 U.S. 827, 836, 70 S.Ct. 894, 899, 94 L.Ed. 1312 (1950); or it might come into play in a patentee's suit for infringement against a licensee going

into business for itself. *See generally Lear*, 395 U.S. at 663–68, 89 S.Ct. at 1907–10.

In a broader sense, however, *Lear* proclaimed a federal policy to eliminate specious patents and to place common ideas in the public domain and general circulation.

Licensees may often be the only individuals with enough economic incentive to challenge the patentability of an inventor's discovery. If they are muzzled, the public may continually be required to pay tribute to would-be monopolists without need or justification. We think it plain that the technical requirements of contract doctrine must give way before the demands of the public interest in the typical situation involving the negotiation of a license after a patent has issued.

*Id.* at 670–71, 89 S.Ct. at 1911.

*Lear* made vague reference to, but did not fully consider, the liability of a licensee for royalty payments in light of the demise of the doctrine of licensee estoppel: "For all these reasons, we hold that Lear must be permitted to avoid the payment of all royalties accruing after Adkins' 1960 patent issued if Lear can prove patent invalidity." *Id.* at 674, 89 S.Ct. at 1913.

Following *Lear* the lower courts set about applying, or interpreting, the fundamental policy considerations underlying the decision. "The key policy motivation weighing the scales in *Lear* in favor of outlawing licensee estoppel was obviously the 'unmuzzling' of licensees to challenge patentability." *Bendix Corp. v. Balax, Inc.*, 471 F.2d 149, 157 (7th Cir. 1972). It is fair to say that clarity and uniformity are not the hallmarks of the decisions interpreting *Lear*.

When the Supreme Court in *Lear* expressed the public policy of encouraging licensees to challenge patents, the lower courts saddled up and went charging off in several different directions. The "spirit of *Lear*" became the battle cry of all patent licensees every time any rule of law came between a licensee and its desire to challenge a patent . . . .. Although an academic observer might characterize post-*Lear* developments as "evolutionary," the contrary positions taken by various courts is truly "chaotic" to the practitioner who must draft a patent license, plan litigation strategy or recommend to a licensee whether or not to pay royalties.

McCarthy, *"Unmuzzling" the Patent Licensee: Chaos in the Wake of Lear v. Adkins*, 45 Geo.Wash.L.Rev. 429, 431 (1977).

It appears that the United States Court of Appeals for the Sixth Circuit has led the way in applying *Lear* to fact situations not addressed by the Supreme Court. *See Id.* at 430–455. The Sixth Circuit first considered the case of a patent licensee who stood by and watched while a challenger successfully attacked the validity of the patent. After final judgment of invalidity was secured by the challenger, the bystander licensee brought suit to recover the royalties it had paid under the now invalid patent. *Troxel Manufacturing Co. v. Schwinn Bicycle Co.*, 465 F.2d 1253 (6th Cir. 1972), (Troxel I), *appeal after remand* 489 F.2d 968 (6th Cir. 1973) (Troxel II). The bystander licensee, the *Troxel* court held, had to pay royalties to the patentee until the date of final judgment of invalidity of the patent. The holding, applying the rule known as the "eviction" rule by analogy to landlord-tenant law, *see* McCarthy, *supra*, at 443 n.97, is consistent with the policy of *Lear* because it encourages an early challenge to the validity of the patent by the licensee. The *Troxel* district court, on the theory that the patent was void *ab initio*, had permitted the licensee to recover all royalties paid to the patentee under the license. The district court also found support in the language in *Lear* that the plaintiff there could avoid all royalties accruing after the patent issued. *Troxel Manufacturing Co. v. Schwinn Bicycle Co.*, 334 F.Supp. 1269 (W.D.Tenn.1971). What the district court had overlooked was the fact situation in *Lear*. In *Lear*, the parties had entered into a licensing agreement *before* the patent issued. Moreover, the licensee challenged the patentability of the discovery by withholding royalties *before* the patent issued. *Lear*, 395 U.S. at 657–60, 671–72, 89 S.Ct. at 1904–06, 1911–12; *Trox-*

*el I,* 465 F.2d at 1259. "Hence, *Lear* could avoid payment of all post-patent royalties only because it challenged the patent before Adkins' patent issued." McCarthy, *supra,* at 437.

In rejecting the *"ab initio"* rule as a basis for recovery of royalties, *Troxel I,* 465 F.2d at 1257–58, states:

A rule that licensees can recover all royalties paid on a patent which later is held to be invalid would do far more than "unmuzzle" licensees. It would give the licensee the advantage of a "heads-I-win, tails-you-lose" option. *Lear* states that it is in the public interest to encourage an early adjudication of invalidity of patents. Application of the holding of the District Court could defeat early adjudication of invalidity and encourage tardy and marginal litigation. If the licensee could recover royalties paid (subject to any statute of limitations) on the basis of an adjudication of invalidity accomplished by another litigant, without incurring the expense or trouble of litigation, there would be less inducement for him to challenge the patent and thus remove an invalid patent from the competitive scene. He would be more likely to wait for somebody else to battle the issue because he would have nothing to lose by the delay.

Rather than stimulating early litigation to test patent validity, such an interpretation of *Lear* would make it advantageous for a licensee to postpone litigation, enjoy the fruits of his licensing agreement, and sue for repayment of royalties near the end of the term of the patent. When a licensed patent is about to expire and the threat of injunction no longer exists, a licensee would have little to lose in bringing an action to recover all the money he has paid in royalties on the ground of the invalidity of the patent. The licensee would have a chance to regain all the royalties paid while never having been subjected to the risk of an injunction. Such an interpretation of *Lear* would defeat one of the expressed purposes of the court in announcing that decision.

Further, the interpretation of *Lear* adopted by the District Court inevitably would discourage the licensing of patents. A patent is a form of intellectual property. The licensing of patents is a business of considerable magnitude.

Under the decision of the District Court, any person who has licensed his invention or patent would have a continuous cloud over any payment of royalties made to him. The cloud might take the form of limiting his credit because of contingent liability. He would be compelled to retain all royalties received in a relatively liquid state until the expiration of the licensed patent, or the running of the applicable statute of limitations.

The Sixth Circuit's next interpretation of *Lear,* in a case factually similar to this case, was *Atlas Chemical Industries, Inc. v. Moraine Products,* 509 F.2d 1 (6th Cir. 1974). There, the court held, a licensee who brings a successful challenge directly against the patentee becomes entitled to recover all royalties accruing after the time of challenge but remains liable to pay the patentee all royalties which had accrued prior to the date of challenge. The same policy grounds which favored adoption of the "eviction" rule in bystander licensee cases favored adoption of the "challenge" rule in direct attacks by licensees.

It is apparent that these equitable considerations commend an opposite result in the present case. The freedom from royalty payments, at as early a date as possible, is a strong "inducement . . . to challenge the patent and thus remove an invalid patent from the competitive scene." *Id.* Moreover, the licensee would not be "likely to wait for somebody else to battle the issue," *id.,* if he were to lose his royalties while sitting on his rights in the hope for a valiant third party to pull the chestnuts out of the fire.

*Id.* at 6.

It is clear, in the Sixth Circuit, that as a general proposition Bear, if it was successful in its challenge, would be able to recover all license royalties accruing after the date

of Bear's intervention as a plaintiff. A similar result would obtain in the Ninth Circuit. *St. Regis Paper Co. v. Royal Industries*, 552 F.2d 309, 313–14 (9th Cir. 1977). The Court of Appeals for the Seventh Circuit, however, has not made a definitive statement in this area of the law, and whether that court will adopt the "challenge" rule of *Troxel* and *Atlas* is yet to be learned.

The reasoning of *Troxel I, supra*, is persuasive that the *"ab initio"* rule which permits recovery of all royalties retroactive to the date of the issuance of the patent is contrary to the spirit of *Lear*. The *"ab initio"* rule discourages prompt challenge to a patent's validity. The rule would permit a licensee to have the cake of a licensing agreement and eat all the royalties too, as the bystander licensee sought to do in *Troxel I*. The Seventh Circuit has cited *Troxel*, which repudiates the *"ab initio"* rule, with approval. *USM Corp. v. Standard Pressed Steel Co.*, 524 F.2d 1097, 1099 (7th Cir. 1974); *Ransburg Electro-Coating Corp. v. Spiller & Spiller, Inc.*, 489 F.2d 974, 978 (7th Cir. 1973). Therefore, this court will not follow the *"ab initio"* rule.

The Seventh Circuit has also rejected the "possession" rule which would make entitlement to royalties depend on whether the licensee had paid or withheld them. "[R]elevant policy considerations, and not possession of the funds, should determine entitlement. . . . [E]ntitlement in these circumstances should not depend upon possession. . . . [E]ntitlement will not depend upon whether the royalties have been paid to the licensor." *USM Corp. v. Standard Pressed Steel Co.*, 524 F.2d 1097, 1099 (7th Cir. 1975).

It may be deduced then, that entitlement to royalties in a challenge suit in the Seventh Circuit will turn on one of three bases: (1) the "renunciation" rule which requires the licensee to stop marking its product with the patent number before entitlement begins; (2) the "challenge" rule under which entitlement begins on the day of formal, legal challenge; or, (3) the "eviction" rule which terminates liability on the date final judgment of invalidity is entered.

Certainly the "eviction" rule can have no application in a direct challenge case such as this. Although *Lear* does not say when royalty entitlement occurs, it makes it clear that entitlement arises at some point *before* final judgment of invalidity. *Lear*, 395 U.S. at 674, 89 S.Ct. at 1913. The Seventh Circuit has recognized this inescapable implication of *Lear* in *Kraly v. National Distillers & Chemical Corp.*, 502 F.2d 1366, 1372 (7th Cir. 1974). There it does not preclude a licensee's possible entitlement to post-challenge royalties but, citing *Troxel I* with approval, praises the district court for applying equitable principles in awarding royalties to the patentee under the circumstances of the *Kraly* case.

The "eviction" rule does not promote the expeditious achievement of final judgment. A patentee would have every incentive to postpone a final determination of the validity of the patent. Every day's delay would grant him the monetary rewards for what eventually might prove itself worthless. Deciding entitlement at a point prior to final judgment, on the other hand, would encourage both patentee and challenger to bring a speedy end to their litigation. The patentee would want to remove the cloud on the validity of the patent while the licensee would want to obtain a refund of royalties.

This court is not unmindful of the arguments in favor of the eviction rule—that it spurs the challenger to vigorous prosecution of his case and that a licensee, even under an invalid patent, receives a valuable benefit from the licensing agreement. The court feels, however, that the merit of those arguments is outweighed by the reasons advanced in the preceding discussion.

Allen argues that *Kraly v. National Distillers & Chemical Corp., supra*, embraces the "renunciation" rule and that a challenger must stop marking its product with the patent number in order to be entitled to recover royalties. This court rejects that interpretation of *Kraly*.

In the first place, the Supreme Court has plainly said that *Lear* allows a licensee not

only to challenge the patent but to do so while performing under the license:

> If [the patent does issue], it may well be invalid, yet many will prefer to pay a modest royalty than to contest it, even though *Lear* allows them to accept a license and pursue the contest without paying royalties while the fight goes on.

*Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 488, 94 S.Ct. 1879, 1889, 40 L.Ed.2d 315 (1974), *quoting Painton & Co. v. Bourns, Inc.*, 442 F.2d 216, 225 (2d Cir. 1971).

Secondly, the Seventh Circuit decisions the subsequent to *Kraly* do not indicate that court has adopted the "renunciation" rule. In *Crane Co. v. Aeroquip Corp.*, 504 F.2d 1086 (7th Cir. 1974), the court cast doubt upon the "renunciation" rule as a general standard upon which to judge royalty entitlement:

*Marking Estoppel*

> The district court found that defendant had "a specific intent to mark the accused devices and represent them as protected by a patent." 364 F.Supp. [547] at 560 [N.D.Ill.1973]. Despite its holding of non-infringement by defendant, the court held that defendant's marking of its modified couplings with plaintiff's patent number estopped it from denying that it was liable for royalties on the modified couplings. Because of our decision that the modified couplings do infringe Claims 6, 9, 11, 14 and 15 of the suit patent, it is unnecessary for us to decide the question whether the court was right in holding defendant liable by reason of marking. We express no opinion on that phase of the decision below.

*Id.* at 1093.

*USM Corp. v. Standard Pressed Steel Co.*, 524 F.2d 1097, 1099 (7th Cir. 1975), in citing *Kraly* with approval, did not do so for the purpose of upholding the "renunciation" rule or "marking estoppel", but did so for the broader proposition that royalty entitlement depends not upon possession but upon "relevant policy considerations."

Moreover, *Kraly* does not depend upon the "renunciation" rule as the basis of decision. Rather *Kraly* can be interpreted as an expression of the "challenge" rule as set forth in *PPG Industries, Inc. v. Westwood Chemical, Inc.*, 530 F.2d 700 (6th Cir. 1976). In *PPG*, the Court stated that it is the first affirmative action on the part of a licensee to bring about early adjudication of a patent's validity that triggers the "challenge" rule. That action, the court said, will normally occur either when the licensee withholds payment or files suit, whichever occurs first. *Id.* at 708.

In *Kraly*, the licensee had withheld royalty payments, but only because the patentee had not fulfilled its contractual obligation to sue alleged infringers, not because the patent was invalid. It was later on that the licensee asserted the invalidity of the patent as a defense when the patentee's sued for non-payment of royalties. At about the same time, some three months later, the licensee stopped marking its product with the patent number.[2] *See Kraly v. National Distillers and Chemical Corp.*, 319 F.Supp. 1349 (N.D.Ill.1970). So the decision of the licensee to stop marking its product virtually coincided with the challenge defense and was the first affirmative action sufficient to trigger the application of the "challenge" rule. *See* McCarthy, *"Unmuzzling" the Patent Licensee: Chaos in the Wake of Lear v. Adkins*, 45 Geo.Wash.L.Rev. 429, 452–53 (1977).

█ The conclusion that arises inescapably from all this discussion is that the "challenge" rule is the only rule that can form the general basis for determining when a licensee is entitled to recoup its royalty payments. No other rule will better promote the federal policy of encouraging challenge to questionable patents and an early adjudication of disputes.

Therefore, Allen is entitled to recover those royalties paid into escrow which ac-

---

**2.** An examination of the record in *Kraly* shows the affirmative defense of patent invalidity was raised by the defendant in its answer on June 25, 1970. Defendant's answer to interrogatory No. 39 shows that the defendant discontinued marking under the patent on September 23, 1970.

crued under the license agreement prior to May 2, 1978, the day on which Bear intervened and challenged Allen's patent. All royalties accruing after that date are to be held in escrow by the clerk of this court as heretofore ordered, pending the outcome of this litigation.

## IV

One question remains. Since Bear has alleged that Allen procured its patent by a fraud upon the Patent Office, should an exception to the "challenge" rule be worked in such a case? Should Bear, assuming it can prove its allegations, be entitled to recover royalties under the *"ab initio"* rule?

■ There is dicta, grounded on the theory of unjust enrichment, that patent fraud may justify a complete refund of royalties. *Lear, Inc. v. Adkins*, 395 U.S. 653, 669–70, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969); *Troxel Manufacturing Co. v. Schwinn Bicycle Co.*, 465 F.2d 1253, 1259 (6th Cir. 1972); *Kraly v. National Distillers and Chemical Corp.*, 319 F.Supp. 1349, 1354 (N.D.Ill.1970). Bear's claim of fraud is one of procurement from the Patent Office, not a fraud upon Bear itself. The distinction is critical. "[I]ts bald assertion that it deserves to recover due to . . . alleged fraud, not on it but on the Patent Office itself, does not state a claim on which relief can be afforded." *Zenith Laboratories, Inc. v. Carter-Wallace, Inc.*, 530 F.2d 508, 515 (3d Cir. 1976).

*Zenith* is persuasive to this court because no compelling reason comes to mind to warrant an exception to the "challenge" rule because of a fraud upon the Patent Office. The same arguments against the *"ab initio"* rule apply here as applied to pre-challenge royalties in the absence of fraud. The antipathy of our system of jurisprudence toward unjust enrichment might have application in a case where· the patentee defrauded the licensee directly, *see Zenith Laboratories*, 530 F.2d at 514–15; *Frequency Electronics, Inc. v. National Radio Co., Inc.*, 422 F.Supp. 609 (S.D.N.Y.1975), *aff'd* 546 F.2d 497 (2d Cir. 1976); but such a case is not before the court.

Moreover, in a fraud upon the Patent Office, it is the public, the ultimate consumer of the patented product, who suffers the impact of the wrong by being deprived of the benefit of competition in the manufacture of the patented product. The wrong is a public wrong, not a private one.

IT IS THEREFORE ORDERED that the clerk of this court pay over to the defendants those royalties deposited in court by the plaintiffs which accrued under the plaintiffs' licenses with the defendants prior to the date the various plaintiffs filed suit challenging the validity of the defendants' patent.

IT IS FURTHER ORDERED that the defendants submit an order to the court setting forth the precise sum to be paid out by the clerk representing escrowed pre-challenge royalties.

IT IS FURTHER ORDERED that all post-challenge royalties accruing to the defendants under their licensing agreements with the plaintiffs be paid to the clerk of this court, as said royalties accrue, to be held in escrow by the clerk under the escrow arrangements heretofore established in this cause.

IT IS FURTHER ORDERED that all orders heretofore entered in this cause, to the extent that they are inconsistent with this order, are hereby modified or superseded by this order; otherwise all previous orders are to remain in full force and effect.

IT IS FURTHER ORDERED that the Allen's motion for making additional conclusions of law and for an evidentiary·hearing on the existence of a *prima facie* case of fraud be, and it hereby is, denied.

### APPENDIX "A"

### ORDER AND PRELIMINARY INJUNCTION

ROBERT D. MORGAN, District Judge.

This cause came on to be heard on June 9, 1978, on applicant for intervention Bear Archery Co.'s (hereinafter Bear) Motion to Intervene and Motion for a Preliminary In-

junction, and the Court having considered Bear's proposed Complaint, Bear's Motion for Temporary Restraining Order Pursuant to Rule 65 FRCP, Bear's Motion Under Rule 65 FRCP (1) for Preliminary Injunction and (2) for an Order Permitting Payment of Royalties into Court, the affidavit submitted to support Bear's motions, and the affidavits, briefs and exhibits submitted in opposition to Bear's motions, and having heard oral arguments in open court, makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

1. United States Letters Patent No. 3,486,495 issued to defendant Holless W. Allen in 1969 and was subsequently assigned to defendant Allen Archery, Inc.

2. Defendant Allen Archery, Inc. and Bear have entered into two successive license agreements with respect to patent No. 3,486,495, the current one of which is Exhibit B attached to Bear's proposed Complaint, and under said agreements Bear has paid approximately $2 million to defendant Allen Archery, Inc. prior to May 2, 1978. It appears reasonably likely that Bear will, during the pendency of this action, become obligated under the current license agreement for further royalties to Allen Archery, Inc. in the amount of at least approximately $500,000 per year.

3. On May 2, 1978, at the time of filing of its foregoing motions and proposed complaint in this action challenging the validity of patent No. 3,486,495, Bear proffered to this Court the sum of One Hundred Seventeen Thousand, Eight Hundred Fourteen Dollars and Forty-Four Cents ($117,814.44), being the amount of royalty payments admitted to be due at that time under the agreement of Exhibit B for the quarterly period January 1—March 31, 1978. This amount was accepted by the Court by Order dated May 4, 1978, and deposited pursuant to that Order on May 12, 1978.

4. As a result of tests conducted in 1974 by defendant Holless W. Allen on a prior art Barna-type bow constructed under circumstances set forth in paragraphs 15, 16 and 17 of Allen affidavit dated May 23, 1978, in opposition to Bear's motions herein, a disclaimer of claims 1, 2 and 11 of patent No. 3,486,495 was filed in the United States Patent and Trademark Office by Allen Archery, Inc., and was published May 20, 1975, at 934 O.G. 888.

5. Said patent has already been challenged by the original plaintiffs in the instant action, as well as by other manufacturers of compound bows in other United States District Courts.

6. If Bear prevails in its declaratory judgment action, seeking that said patent be held invalid, unenforceable and/or not infringed, and royalty payments under the license agreement of Exhibit B are ordered refundable to Bear, it is reasonably likely that defendant Allen Archery, Inc. would be unable to repay such royalties.

7. As a result of this likely inability to recoup its royalties from defendant Allen Archery, Inc. in the event that a refund is ordered, Bear would be irreparably damaged if required to pay royalties directly to Allen Archery, Inc. and would have no remedy at law with respect to recoupment thereof.

8. Defendants have failed to demonstrate any prejudice to them which might result from the granting of Bear's motion for a preliminary injunction *pendente lite*, and no damage has been caused to defendants as a result of the Temporary Restraining Order granted heretofore.

9. Royalties accrued under the current license agreement of Exhibit B for the period from January 1, 1978, through May 1, 1978, have not been paid to Allen Archery, Inc., and are considered by this Court to be pre-challenge royalties.

10. *Bear Archery Co. has during at least the period from January 1, 1978 up to the present date complied with the license agreement of Exhibit B which required marking bows sold under it with the number of Patent No. 3,486,495.*

11. Where any finding of fact, in whole or in part, may be construed as a conclusion of law, it should be so construed.

## CONCLUSIONS OF LAW

1. Bear's moving papers establish a proper case for permissive intervention under Rule 24(b) F.R.C.P., and its motion to intervene should be granted.

2. During the pendency of an action where a licensee is challenging the validity of the licensed patent and the enforceability of the license, the licensee may keep its license *by ceasing to mark its products made under the license agreement with the number of the licensed patent and* by paying royalties *on such unmarked products* into an escrow account when the licensor may not have sufficient financial resources to repay royalties accruing under the license if it is successful in its challenge.

3. In view of this Court's finding that defendant Allen Archery, Inc. might not be able to repay royalties should the patent in suit be declared to be invalid, Bear may during the pendency of this action properly pay royalties due under its license agreement *on products not marked with the number of the licensed patent*, into this Court in escrow rather than directly to defendant Allen Archery, Inc.

4. Pre-challenge royalties are those paid to the patent owner before the validity of the patent is challenged *by the paying licensee*, and include unpaid royalties due or accrued before such date.

5. In view of the fact that some of the claims of the patent in suit have been disclaimed and since the validity of the patent is being challenged by other compound bow manufacturers in other United States District Courts, there is a reasonable likelihood of success by Bear in its declaratory judgment action and there is a reasonable likelihood of irreparable damage to Bear if it were to be required to continue to pay royalties under the license agreement of Exhibit B directly to defendant Allen Archery, Inc. during the pendency of this action.

6. Payment of royalties *on products not marked with the number of the licensed patent* into Court in escrow pursuant to this Order, [including the royalty payment accepted by this Court on May 4, 1978] *hereafter* does not constitute a breach of the license agreement of Exhibit B. The license agreement is still in effect and *Bear is entitled to an injunction pendente lite against its cancellation for breach of the provision relating to marking products with the number of the licensed patent.*

7. The past and continued marking by Bear of its compound bow products with the number of U.S. Patent No. 3,486,495, pursuant to the terms of its license agreement with defendant Allen Archery, Inc., is without prejudice to Bear's status as one challenging the validity of said patent in this Court and shall not act as a bar or estoppel to any right of Bear either to challenge the validity, enforceability and/or infringement of the patent or to any right of Bear to recoup the royalties placed in escrow pursuant to this Order, and any other sums to which it may be entitled should the foregoing patent subsequently be declared to be invalid.

8. *Even should the licensed patent eventually be held invalid, unenforceable or not infringed, Bear is not relieved of its obligation to pay royalties for the period in which it enjoys the benefit of its license by representing to the public that its product is licensed under the Allen patent. So long as Bear sought and continues to seek the protection of the patent, it is only equitable that it should discharge its royalty obligation under the license agreement.*

9. Wherever any conclusion of law, in whole or in part, constitutes a finding of fact, it should be so construed.

IT IS THEREFORE ORDERED:

(1) that Bear be permitted to intervene as a plaintiff in this action and that Bear's Complaint be submitted to the appropriate United States Marshal in the Western District of Missouri for service upon the defendants or served in any other appropriate manner as provided for in the Federal Rules of Civil Procedure;

(2) that the defendants Holless W. Allen and Allen Archery, Inc., a corporation, and their officers, attorneys, servants, agents, associates, members, employees and all persons acting on their behalf or at their di-

rection be restrained and enjoined from bringing any other action in any other court, whether state or federal, against Bear or any of its customers, suppliers, persons controlling or controlled by Bear, or any other party associated or affiliated with Bear with regard to any subject matter which might reasonably be pleaded to or counterclaimed in this action or arising out of or relating to the foregoing license agreement or U.S. Patent No. 3,486,495;

(3) that Bear shall be permitted to pay into this Court all amounts of royalties which shall accrue under the license agreement of Exhibit B by reason of the sale of bows *not marked with the number of U.S. Patent No. 3,486,495* pending the final disposition of this action by court order or otherwise by agreement of the parties approved by the Court. All such amounts paid into court by Bear shall be deposited by the Clerk of this Court in an interest-bearing account or invested in interest-bearing securities of the United States of America until further order of the Court;

*(4) that a check drawing on the monies deposited with this Court by Bear pursuant to the September 6, 1978 Order of this Court be made payable by the Clerk of this Court to Allen Archery, Inc. in the total amount of all such deposits plus accrued interest, if any, and that said check be delivered to Allen Archery, Inc.*

(5) that Allen Archery, Inc. and all persons acting on its behalf or under its direction shall be enjoined from terminating the license agreement of Exhibit B so long as Bear complies with the provisions of that agreement, including the submission of quarterly royalty reports to Allen Archery, Inc., except as set forth in this Order;

(6) that this Order is temporary in nature and subject to modification by this Court upon motion duly brought by any party; and

(7) that Bear shall continue in full force and effect its present bond, posted herein at the time this Court issued the Temporary Restraining Order, in the sum of Six Thousand Dollars ($6,000), as security for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

Entered: <u>September 6, 1978</u>

<u>Nunc pro tunc</u> June 9, 1978

Amended: April 2, 1979