530 F.2d 700
 189 U.S.P.Q. 399
 PPG INDUSTRIES, INC., Plaintiff-Appellant,
v.
WESTWOOD CHEMICAL, INC., and Eastwood Chemical, Inc.,
Defendants-Appellees.
PPG INDUSTRIES, INC., Plaintiff-Cross Appellee,
v.
WESTWOOD CHEMICAL, INC., et al., Defendants-Cross Appellants.
 Nos. 75--1714, 75--1715.
 United States Court of Appeals,
Sixth Circuit.
 Argued Dec. 16, 1975.
Decided Feb. 18, 1976.
 
 William H. Webb, John M. Webb, Webb, Burden, Robinson & Webb, Pittsburgh, Pa., Warren Daane, Baker, Hostetler & Patterson, Cleveland, Ohio, for plaintiff-appellant.
 Paul A. Weick, Weick & Genovese, Akron, Ohio, T. A. TeGrotenhuis, Cleveland, Ohio, for defendants-appellees.
 Before PHILLIPS, Chief Judge, and PECK and MILLER, Circuit Judges.
 PHILLIPS, Chief Judge.
 
 
 1
 As of what date does the liability of a patent licensee for royalties under an invalid patent terminate pursuant to Lear v. Adkins, 395 U.S. 653, 89 SCt. 1902, 23 L.Ed.2d 610 (1968)? This recurring question is presented on the present appeal under a factual situation that differs somewhat from those involved in other decisions of this court dealing with this issue.
 
 
 2
 Ordinarily, liability would terminate as of the date the licensee ceases the payment of royalties for the purpose of prompting an early adjudication of the invalidity of the patent. However, under the facts and circumstances presented here, we hold that the liability of the licensee terminated as of the date this suit was filed on January 18, 1971.
 
 
 3
 This is a declaratory judgment action to declare unenforceable a nonexclusive patent royalty agreement executed between appellant, PPG Industries, Inc. (hereinafter referred to as PPG) and appellee, Westwood Chemical, Inc. (hereinafter referred to as Westwood).
 
 
 4
 In case No. 75--1714, PPG appeals from the judgment of the District Court awarding Westwood back royalties from the time PPG ceased making payments until this action was filed, despite the court's finding of patent invalidity based on collateral estoppel. In case No. 75--1715, Westwood cross-appeals from the court's disallowance of royalties beyond the date PPG filed this action. We affirm the judgment of the District Court as to both issues.
 
 
 5
 * On January 1, 1962, PPG and Westwood entered into the license agreement involved in this action. Under that agreement, Westwood granted to PPG a nonexclusive license under United States Patents No. 2,742,378 ('378) and No. 2,841,566 ('566), and several foreign patents. Its pertinent provisions are as follows:
 
 Whereas, PPG is interested in
 
 6
 (1) Obtaining a non-exclusive license to make, use and sell articles and to practice processes claimed in one or more of said U.S. patents;
 
 
 7
 (2) Obtaining for its customers immunity from suit for infringement of licensed patents as hereafter defined because of its customers' manufacture, use or sale of licensed products as claimed in the licensed patents in which are incorporated primary products on which the royalty hereinafter provided for is payable by PPG to Westwood, and
 
 
 8
 (3) Obtaining immunity from suit for infringement of any foreign patents as hereinafter defined for itself and its customers for practice of any of the inventions covered in said foreign patents wherein primary products are used on which royalty as hereinafter provided for is payable by PPG to Westwood.
 
 
 9
 3.3 Westwood hereby grants to PPG the right to grant to customers of PPG a royalty-free immunity from suit for infringement under the licensed patents and foreign patents for the manufacture, use or sale of licensed products where such licensed products contain a product upon which a royalty as hereinafter provided for is payable by PPG to Westwood. Such immunity as provided for in this subsection, however, shall not extend to such customers' manufacture, use or sale of a composite article or method of making same covered by a claim or claims of an unexpired licensed patent if in such composite article there is incorporated additional fibers and/or inorganic solids on which royalty would be due Westwood from a licensee of Westwood if such additional fibers or inorganic solids had been acquired from such licensee of Westwood.
 
 Section 6--Termination
 
 10
 6.1 This agreement shall terminate with the expiration of the last to expire of the licensed and foreign patents; subject, however, to earlier termination as provided hereafter in this Section 6.
 
 
 11
 6.2 PPG shall have the right to terminate this agreement by giving Westwood thirty (30) days' notice in writing of its intentions so to do.
 
 
 12
 6.4 In the event that any time hereafter there shall not be pending a suit by Westwood against an infringer of the licensed patents based upon infringement on such scale that if licensed on the terms herein imposed the annual royalty return to Westwood would be at least two thousand dollars ($2,000) per year, then if any person or concern, without a license or right under the licensed patents, shall produce products coming within the definition of licensed products and if:
 
 
 13
 (1) PPG shall give Westwood written notice that such production has infringed a claim or claims of the licensed patents and
 
 
 14
 (2) PPG shall request that suit be brought under a licensed patent against such person, concern or third party because of such infringement and
 
 
 15
 (3) Westwood fails to bring such suit under some one or more of the licensed patents or to obtain discontinuance of such infringement or to license such infringer within six (6) months after receipt of such request, and
 
 
 16
 (4) Sales of said person or concern of such products is of such volume as to produce, if licensed, royalties of at least two thousand dollars ($2,000) per year,
 
 
 17
 then, in such case PPG shall be relieved of the payment of royalties, with respect only as to the licensed patents so alleged to be infringed until the day Westwood shall bring suit against an infringer or shall obtain discontinuance of said infringement or license said infringer; provided, however, that if during said six (6) months' period Westwood shall have entered into bona fide negotiations to license such infringer and within six (6) months after the expiration of said such six (6) months' period shall license such infringer, then PPG shall not be relieved from paying royalties under this subsection with respect to any period for which royalties shall be paid on such material by such infringer except to the extent that the rate of royalties payable by PPG hereunder exceeds the rate of royalties paid by such infringer for such period.
 
 
 18
 6.5 Upon failure or inability of either party to perform any obligation under this agreement, the other party may give notice in writing to the party in default specifying the thing or matter requiring performance. Unless such performance be accomplished within sixty (60) days following the giving of such notice, the party seeking performance may give further written notice to the party in default terminating this agreement, in which event this agreement shall terminate on the date specified in such further notice. Waiver by either party of any single failure or inability or succession of failures or inabilities shall not deprive the other party of any right to terminate this agreement arising by reason of any subsequent failure or inability.
 
 
 19
 Pursuant to § 6.4 of the agreement, patent infringement suits were brought by Westwood in the Northern District of Ohio against companies alleged to infringe patents '378 and '566. In civil action C62-681, Westwood sued Ferro Corporation. In civil action C63--208, Molder Fiber Glass Body Co. was sued. In civil action No. C63--460, Westwood sued Johns-Manville Fiber Glass and Owens Fiberglass Corp., and on September 18, 1963, Ferro Corporation was made an additional defendant. In 1967, Westwood sued Certain-Teed Products Corp. in civil action c67--775 and Dow Corning Corp. in civil action C67--787.
 
 
 20
 On April 15, 1968, Westwood, Owens Corning Fiberglass, Johns-Manville and Ferro stipulated that Westwood Chemical, Inc. v. Owens Corning Fiberglass Corp., C63--460, as severed, would be the first case tried (hereinafter referred to as OCF); and that the final decision in that case as to the validity of '378 and '566 would be binding as to all parties. Later, Certain-Teed Products joined in this stipulation.
 
 
 21
 In mid-1968, PPG became concerned about the delays in bringing the OCF infringement suit to trial and so informed Westwood. Westwood advised that, due to extensive discovery, the OCF case would not come to trial until December 1968. The trial did not begin until June 1969. The evidence discloses that during this time PPG offered Westwood full cooperation in prosecuring the action against OCF, including the making of the PPG laboratory facilities available to Westwood and providing both business and technical information. Notwithstanding, on January 6, 1969, PPG withheld royalty payments for the last six months of 1968 and continued to withhold payments until the present action was filed on January 18, 1971. Although PPG withheld royalty payments, no notice was given to Westwood as to the reasons for nonpayment. When Westwood inquired about the unpaid royalties, PPG's chief patent counsel merely informed Westwood 'that he would look into it and see what could be done.'
 
 
 22
 Prior to the filing of the present action District Judge James C. Connell, on July 30, 1970, issued his findings of fact and conclusion of law in the OCF case, 317 F.Supp. 201 (N.D.Ohio 1970). He held both patents invalid and not infringed. On appeal, this court affirmed Judge Connell's ruling, 6 Cir., 445 F.2d 911 (1971). Certiorari was denied by the Supreme Court. 405 U.S. 917, 92 S.Ct. 941, 30 L.Ed.2d 786 (1972). PPG filed the present action on January 18, 1971. Subsequent to the OCF decision of this court on August 24, 1971, PPG amended its complaint in the present case to assert invalidity of patents '378 and '566 under the doctrine of collateral estoppel announced in Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation et al., 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971).
 
 
 23
 In the present action, the District Court found that the six year delay between the filing and trial of the OCF case was 'largely due to the extensive and contested discovery;' that PPG failed to establish that Westwood caused the trial delay; and that Westwood would not continue to delay bringing the suits to trial so long as PPG was paying royalties. The court found that pursuant to § 6.4 of the licensing agreement, Westwood brought suit within six months of the request; therefore, neither § 6.4 nor any other provision of the agreement authorized PPG to suspend payments for delay in prosecution of the infringement suit.
 
 
 24
 In seeking a declaratory judgment that the licensing agreement is unenforceable and a judgment against Westwood on its counterclaim for back royalties, PPG does not rely on any claim that Westwood breached the licensing agreement. Rather, PPG advances arguments based on federal patent law policies enunciated in Lear v. Adkins, supra. PPG argues that since patents '378 and '566 were adjudicated invalid in the OCF case, the doctrine of collateral estoppel announced in Blonder-Tongue, supra, applies. Accordingly, PPG insists that the overriding federal policy favoring free competition in ideas not meriting patent protection would be frustrated if this court should force back royalty payments under invalid patents. In short, PPG contends that Lear requires nothing more to terminate liability under the licensing agreement than that the licensee cease making royalty payments under a patent which subsequently is held to be invalid.
 
 
 25
 Westwood argues that the Lear policy is to promote an early adjudication of invalidity; consequently, mere cessation of payments is not enough. The licensee, Westwood contends, must either cease payment and immediately file suit or cease payment and notify the licensor that the patents are invalid; and that only the taking of some affirmative action in addition to cessation of payment will encourage an early adjudication of invalidity.
 
 
 26
 The District Judge held that the present action was controlled neither by Lear nor the several post-Lear decisions decided by this court; rather, that this case is one within the equity jurisdiction of federal courts. In balancing the equitable considerations between the parties, the court found that PPG had the unqualified right to terminate the license under § 6.2 of the agreement; however, PPG chose to perpetuate the license and continued to receive benefits thereunder. The court found that even after Judge Connell ruled in the OCF case that the patents were invalid, PPG still did not terminate the agreement. Accordingly, the court found that PPG was liable for the back royalties since it received the benefits of the agreement and never challenged validity until it filed this action on January 18, 1971.
 
 II
 
 27
 We agree with the result reached by the District Judge, but not with all of his reasoning.
 
 
 28
 Under Lear a licensee has the right to cease paying royalties at any time for the purpose of prompting an early adjudication of the invalidity of a patent. In Blonder-Tongue v. University Foundation, 402 U.S. 313, 346, 91 S.Ct. 1434, 1451, 28 L.Ed.2d 788 (1971), the Supreme Court said:
 
 
 29
 Lear permits an accused infringer to accept a license, pay royalties for a time, and cease paying when financially able to litigate validity, secure in the knowledge that invalidity may be urged when the patentee-licensor sues for unpaid royalties.
 
 
 30
 We are of the opinion the District Judge erred in his interpretation of Lear and the decisions of this court in Troxel Manufacturing Co. v. Schwinn Bicycle Co., 6 Cir., 465 F.2d 1253 (1972) (hereinafter referred to as Troxel I); Troxel Manufacturing Co. v. Schwinn Bicycle Co., 6 Cir., 489 F.2d 968 (1973), cert. denied, 416 U.S. 939, 94 S.Ct. 1942, 40 L.Ed.2d 290 (1974) (hereinafter referred to as Troxel II); and Atlas Chemical Industries, Inc. v. Moraine, 6 Cir., 509 F.2d 1 (1974). The basic error of the District Court is reflected in this statement:The present case cannot be governed by this reference to Lear since the present case is not a Lear situation . . . (here) 'the licensee became an incidental beneficiary to the invalidity established . . . by another party'.
 
 
 31
 The two holdings of Lear are as follows: (1) a licensee is not estopped to interpose the invalidity of the licensed patent as a defense to an action brought by the licensor to enforce the license agreement, 395 U.S. at 656, 671, 89 S.Ct. 1902; and (2) a licensee cannot be required to continue to pay royalties during the time he is challenging patent validity in the courts, 395 U.S. at 673, 89 S.Ct. 1902. The policy underlying these holdings was to "unmuzzle' licensees so that an early adjudication of invalidity could inure to the public interest.' Atlas Chemical, 509 F.2d at 6; Troxel I, 465 F.2d at 1257; see Lear, 395 U.S. at 670, 673, 89 S.Ct. 1902.
 
 
 32
 Our prior decisions recognize this policy. In Troxel I, the plaintiff-licensee was attempting to obtain a refund of all royalties ever paid on a patent which subsequently was held to be invalid. We held that such a result would thwart the policy announced in Lear:
 
 
 33
 A rule that licensees can recover all royalties paid on a patent which later is held to be invalid would do far more than 'unmuzzle' licensees. It would give the licensee the advantage of a 'heads-I-win, tails-you-lose' option. Lear states that it is in the public interest to encourage an early adjudication of invalidity of patents. Application of the holding of the District Court could defeat early adjudication of invalidity and encourage tardy and marginal litigation.
 
 
 34
 Rather than stimulating early litigation to test patent validity, such an interpretation of Lear would make it advantageous for a licensee to postpone litigation, enjoy the fruits of his licensing agreement, and sue for repayment of royalties near the end of the term of the patent. When a licensed patent is about to expire and the threat of injunction no longer exists, a licensee would have little to lose in bringing an action to recover all the money he has paid in royalties on the ground of the invalidity of the patent. 465 F.2d at 1257 (Emphasis added.)
 
 
 35
 Although the agreement in Troxel I was voidable under Lear, we refused to hold it void ab initio entitling the licensee to recoup all royalties paid. We held in Atlas Chemical that Troxel 'was not the type of suit authorized by' Lear since the full refund situation of Troxel would not promote an early adjudication of invalidity. 509 F.2d at 5.
 
 
 36
 In Atlas Chemical, the plaintiff-licensee brought suit to declare the patent invalid. The licensee placed the royalty payments in escrow during the period the action was pending. We held that since Lear allows a party freedom from royalty payments during a patent validity action, the fact that the payments were placed in escrow does not change the result. Escrow payments were held to be tantamount to nonpayment. We held the Atlas Chemical agreement voidable under Lear; in addition, we said that the royalty question in '(t)he instant case is the type of suit authorized' by Lear since the factual situation in Atlas Chemical encouraged an early adjudication of invalidity. 509 F.2d at 5.
 
 
 37
 The District Court held that Lear did not apply to the present suit, since PPG did not initially establish invalidity, rather, invalidity was litigated by another party which PPG relied on under the doctrine of collateral estoppel. The District Court stated:
 
 
 38
 The present case cannot be governed by this reference to Lear since the present case is not a Lear situation. Rather, licensee PPG generally corresponds to the following description of licensee Troxel contained in Atlas, supra.
 
 
 39
 In the Troxel cases the licensee was doing nothing to contest the validity of the patent. The licensee continued to enjoy the fruits of the license. Only because of Blonder-Tongue . . . did the licensee become an incidental beneficiary to the invalidity established in the litigation initiated and prosecuted by another party in another circuit.
 
 
 40
 We do not agree that a distinction can be drawn between Lear and Troxel because of the application or non-application of the doctrine of collateral estoppel. The distinction between these two cases is that the full refund sought in Troxel would not promote an early adjudication of the invalidity of the patent. If a full refund were granted on all royalties paid from the date of the execution of the license agreement, the courts would be faced with a myriad of suits by licensees who have waited until the patent is about to expire in the hope that the patent would be declared invalid. Such a practice would encourage and reward the late adjudication of invalidity and defeat the purposes of Lear.
 
 
 41
 We agree with the District Court that, under Lear, PPG did not relieve itself of liability for royalties by ceasing payment under the facts of this case. It is reemphasized that under Lear and Blonder-Tongue, a licensee can terminate its liability for royalties under an invalid patent by ceasing payment for the purpose of prompting an early adjudication of the invalidity of the patent. The actions of PPG in the present case in ceasing the payment of royalties were not of the type to prompt an early adjudication of invalidity. It is for this reason, and not for the reasons stated by the District Judge, that the liability of PPG for royalties did not cease as of the date of termination of payments.
 
 III
 
 42
 Relying on the above-quoted language of Blonder-Tongue and upon Troxel I, 465 F.2d at 1260, Troxel II, 489 F.2d at 973, and Atlas Chemical, 509 F.2d at 5, PPG contends that the licensee is required under Lear to do nothing more than cease making royalty payments to avoid further liability, if the patent thereafter is held to be invalid.
 
 
 43
 Something more than mere non-payment is required to 'encourage an early adjudication of invalidity.' Troxel I, 465 F.2d at 1257. (Emphasis added.) In Lear, the licensee took the additional affirmative step of notifying the licensor of invalidity:[1]
 
 
 44
 In 1957, after Adkins' patent application had been rejected twice, Lear announced that it had searched the Patent Office's files and had found a patent which it believed had fully anticipated Adkins' discovery. As a result, the company stated that it would no longer pay royalties on the large number of gyroscopes it was producing at its plant in Grand Rapids, Michigan (the Michigan gyros). 395 U.S. at 659, 89 S.Ct. at 1905. (Emphasis added.)
 
 
 45
 In Atlas Chemical, the licensee took the additional affirmative action of filing suit. Accordingly, in both Lear and Atlas Chemical the action taken, in addition to nonpayment, was sufficient to encourage an early adjudication of the invalidity of the patent.
 
 
 46
 In the present action, PPG failed to give notice of any kind. When asked why the payments were being withheld, PPG's general counsel told Westwood that it would be 'looked into.' Not only did PPG fail to take any action that would encourage adjudication of invalidity, but PPG actively assisted Westwood in the OCF case in attempting to uphold validity.
 
 
 47
 The District Court found that counsel for the parties had a meeting on June 16, 1968, and that a memorandum was prepared as an accurate reflection of what occurred. This memorandum stated that 'the main reason for the meeting was to bring PPG up to date on the status of the lawsuits.' The District Court said:
 
 
 48
 While the memorandum notes PPG's 'concern about the delay in bringing the case to trial,' it says nothing about any intention to cease royalty payments. Indeed, refutation of the purported cessation of royalty payments is provided by PPG's payment of royalties for the first half of 1968, after the meeting of June 26, 1968.
 
 The District Court further found:
 
 49
 An interoffice memorandum from Mr. Johnston to PPG officials dated July 10, 1969, states:
 
 
 50
 Near the end of December, 1968 I learned, upon making inquiry of the progress in the trial, that once again there was a delay and that the case would probably not come to trial until June 1969.
 
 The letter then states:
 
 51
 On January 6, 1969, I advised Legrand Skinner, accountant at Works 52, to hold up the royalty payment for the last six months of 1968.
 
 
 52
 Mr. Johnston did not communicate this information to Westwood that PPG was '(holding) up the royalty payment for the last six months of 1968.' Arland T. Stein, Pittsburgh trial counsel of Westwood called PPG chief patent counsel, Oscar Spencer, in late May or early June, 1969 to inquire about the nonpayment of royalties for the last half of 1968. Mr. Spencer informed Mr. Stein 'that he would look into it and see what could be done,' but Mr. Stein says he did not hear anything further.
 
 
 53
 Mr. Johnston's interoffice letter of July 10, 1969 observes
 
 
 54
 I believe that the delay in bringing the suits to trial was unreasonable and that Westwood would have continued to delay bringing these suits to trial as long as PPG was paying a royalty. By such action, I believe that they have breached the Agreement. This is the basis for my holding up the royalty payments.
 
 
 55
 As previously seen, six years elapsed between filing and trial of the OCF case. A review of the docket sheets and an examination of the file indicate that the delay appears to have been largely due to the extensive and contested discovery. In any event, the plaintiff has not established, as Mr. Johnston concluded, that Westwood caused the trial delay or that 'Westwood would have continued to delay bringing these suits to trial as long as PPG was paying a royalty.'
 
 
 56
 For the reasons stated above, we hold that the license agreement, although voidable under Lear, was enforceable for royalties accruing after the date PPG ceased making payments thereunder.
 
 
 57
 The District Court relied heavily on the fact that PPG failed to terminate the license under § 6.2 of the agreement. We are not persuaded that it is necessary for the licensee to repudiate the agreement in order to encourage an adjudication of invalidity. In Lear, the license agreement contained a provision which gave the licensee the unqualified right to terminate the license. Adkins v. Lear, Inc., 67 Cal.2d 882, 64 Cal.Rptr. 545, 435 P.2d 321, 325 (1968). The license was not terminated even while the case was on appeal before the Supreme Court. Consequently, the Supreme Court's reference to 'unmuzzling' in Lear does not depend upon the presence or absence of a termination clause. See American Sterilizer Co. v. Sybron Corp., 526 F.2d 542 (3d Cir. 1975); Meditronic, Inc. v. American Optical Co., 327 F.Supp. 1327, 1331 (D.Minn.1971).
 
 IV
 
 58
 The sole remaining issue is the disposition of Westwood's claim that royalties are due beyond the date PPG filed suit-- January 18, 1971. Westwood insists that it is entitled to recover unpaid royalties until eviction of the patents occurred--August 24, 1971 (the date this court rendered its decision in the OCF case). Westwood's argument is premised on the ground that the facts in the present case do not represent a Lear situation; accordingly, the eviction doctrine of Drackett Chem. Co. v. Chamberlain, 63 F.2d 853 (6th Cir. 1933), reaffirmed in Troxel I and II, is controlling.
 
 
 59
 The District Court held that since Lear permits a licensee freedom from royalty payments while he is contesting validity, it would be inequitable to use a date later than the date of filing suit. Although in Part III above we held that a Lear situation was not presented at the time PPG merely ceased making payments, it is our opinion that PPG conformed to the Lear policy when the present suit was filed. By taking this additional affirmative action (i.e., filing suit), PPG encouraged an early adjudication of invalidity. When eviction occurs subsequent to the filing of an action, the filing date must be the cut off date to conform to the policy of Lear:
 
 
 60
 The decisive question is whether overriding federal policies would be significantly frustrated if licensees could be required to continue to pay royalties during the time they are challenging patent validity in the courts.
 
 
 61
 It seems to us that such a requirement would be inconsistent with the aims of federal patent policy. Enforcing this contractual provision would give the licensor an additional economic incentive to devise every conceivable dilatory tactic in an effort to postpone the day of final judicial reckoning. We can perceive no reason to encourage dilatory court tactics in this way. Moreover, the cost of prosecuting slow-moving trial proceedings and defending an inevitable appeal might well deter many licensees from attempting to prove patent invalidity in the courts. 395 U.S. at 673, 89 S.Ct. at 1912.
 
 
 62
 The date of the eviction of the patent, which was controlling in Troxel, is of no significance in the present case. Under Lear, liability for royalties ordinarily is terminated on one of two dates (i.e., if before eviction), whichever first occurs: (1) on the date the licensee ceases the payment of royalties for the purpose of prompting an early adjudication of invalidity; or (2) on the date the licensee files suit (or counter-claim) attacking the validity of the patent.[2] It is only when the licensee continues to pay royalties, and does not file suit until after the patent has been adjudged invalid, that the cut off date for liability is the date of the eviction of the patent.
 
 
 63
 The judgment of the District Court is affirmed. No costs are taxed. Each party will bear its own costs on this appeal.
 
 
 
 [1]
 Even though the cessation of payments by PPG was pre-Lear, PPG cannot argue that it had no duty to notify Westwood that the patents were invalid since the doctrine of licensee estoppel was significantly eroded at that time. The Supreme Court stated in Lear:
 Adkins suggests that any decision repudiating licensee estoppel as the general rule should not be retroactively applied to contracts concluded before such a decision is announced. Given the extent to which the estoppel principle had been eroded by our prior decisions, we believe it clear that the patent owner--even before this decision--could not confidently rely upon the continuing vitality of the doctrine. Nor can we perceive that our decision today is likely to undermine any existing legitimate business relationships. Moreover, the public's interest in the elimination of specious patents would be significantly prejudiced if the retroactive effect of today's decision were limited in any way. 395 U.S. at 674, n. 19, 89 S.Ct. at 1913. (Emphasis added.)
 
 
 [2]
 It is to be emphasized that the issue of collateral estoppel was not raised in the present case until after the filing of this action. This suit was filed January 18, 1971. Eviction of the patent occurred on August 24, 1971, the date this court released our opinion in the OCF case. PPG amended its complaint to assert the doctrine of collateral estoppel on August 24, 1971