Jerome H. **LEMELSON**, Plaintiff,

v.

**SYNERGISTICS RESEARCH CORP. and Allan M. Elfman, Defendants.**

No. 78 Civ. 4335 (LLS).

United States District Court,
S.D. New York.

Sept. 18, 1987.

Golenbock and Barell, New York City, Michael C. Silberberg, Peter D. Raymond, of counsel, for plaintiff.

Wigman & Cohen, P.C., Arlington, Va., Victor M. Wigman, George C. Myers, Jr., of counsel, Natter & Natter, New York City, for defendants.

STANTON, District Judge.

Plaintiff, Jerome H. Lemelson ("Lemelson"), asserts breach of contract, unjust enrichment, fraud and breach of fiduciary duty claims in this action against defendants Synergistics Research Corp. ("Synergistics") and its president, Allan M. Elfman ("Elfman"). Briefly, the claims arise out of the breakdown of a business relationship between the parties, involving three patents—U.S. Patent Nos. 3,032,345 ("345"), 3,857,566 ("566") and 3,917,271 ("271").[1] All the patents relate to a velcro dart game.

The validity of the '566 and '271 patents is the subject of the pending cross-motions for partial summary judgment. The '345 patent was held invalid in *Centsable Products, Inc. v. Lemelson*, 75 Civ. 3717 (N.D. Ill. June 12, 1978), *aff'd*, 591 F.2d 400 (7th

---

1. The various claims have been extensively described in opinions by Judge Leval and Judge Leisure: January 8, 1981 (denying plaintiff's motion to disqualify defendants' counsel); February 18, 1983 (denying defendants' motion for summary judgment on antitrust counterclaim); October 30, 1984 (denying cross-motions for summary judgment); September 4, 1985 (granting plaintiff's motion to file a second amended complaint).

Cir.), *cert. denied,* 444 U.S. 840, 100 S.Ct. 79, 62 L.Ed.2d 52 (1979).

### Relevant Background

On October 5, 1973, plaintiff Lemelson and defendant Elfman entered into an agreement (" '73 Agreement") licensing Lemelson's '345 patent to defendant Synergistics, a small manufacturer of toys and games, of which Elfman is the president and sole shareholder. The '345 patent discloses a velcro target game. (Defendants' Exh. B.) Shortly after entering into the '73 Agreement, Lemelson and Elfman jointly filed additional patent applications with the U.S. Patent and Trademark Office regarding improvements on the '345 velcro target game. By agreement with Elfman, Lemelson personally prepared and prosecuted these applications,[2] which resulted in the issuance of the '566 and '271 patents.[3] The '566 patent covers an improved target structure, (Defendants' Exh. D), while the '271 patent discloses an improved ball-shaped missile. (Defendants' Exh. G.)

Before those patents issued, Lemelson and Elfman entered into a second agreement (" '74 Agreement") providing that:

I.   Neither Party will license or sell any rights defined by any patent or patents which may issue from the above patent applications or divisions or continuations thereof without the written consent of the other party.

II.   All royalties or other considerations which may be received as a result of licensing and/or manufacturing of the inventions defined in the above identified patent applications are to be equally divided between us.

(Defendants' Exh. F.) (There may be a dispute, immaterial for present purposes, whether the "above ... applications" referred to the '271 or the '881 (see fn. 3) as well as the '566, or all three).

In December, 1975, Lemelson entered into a third agreement (" '75 Agreement") with Elfman and Synergistics. The '75 Agreement contemplated the use of the Synergistics Licensing Corporation to own, license, receive and distribute royalties from, and enforce the '345, '566 and '271 patents. Although that corporation was formed, it has not been utilized and the '75 Agreement never went into operation.

Plaintiff claims that the '74 and '75 Agreements reflect the parties' understanding that he was to receive half the royalties realized from the exploitation of the '271 and '566 patents. Defendants contend that (1) Elfman is a co-owner of the patents and is named in them as co-inventor, (2) Elfman and Synergistics are—and have always been treated as—one and the same entity, and so both defendants are co-owners of the patents with Lemelson, and therefore (3) Synergistics has the right to make and sell products covered by the '566 and '271 patents without paying, or accounting, for royalties to Lemelson. (Defendants agree they would be liable to account to Lemelson for proceeds obtained from third parties even if the patents are invalid, but deny any are owing.)

For purposes of this motion, however, defendants assume that the '74 and '75 Agreements oblige them to pay royalties to Lemelson for Synergistics' manufacturing and selling of products covered by the '566 and '271 patents. They argue that they should be relieved of any such assumed liability, because of the invalidity of the '566 and '271 patents. Thus, the central question here is whether those patents are valid.

Before reaching that question, it is useful to decide two other issues: (1) whether defendants can assert patent invalidity as a defense to plaintiff's claim for royalties

---

**2.** The joint patent applications named Lemelson and Elfman as co-inventors. Defendants contend that Daniel Ferris, an employee of Synergistics, is the sole inventor of the inventions claimed in the joint patents, and that Lemelson is not entitled to recover any royalties under the joint patents. This factual dispute is not, however, material to the disposition of the present motion.

**3.** A third patent was issued as No. 3,927,881 ("881"). It is directed to a molded ball construction with integrally formed hook-like fasteners, which was never commercialized. It is not at issue in this lawsuit.

from Synergistics' manufacture and sale of products covered by the '566 and '271 patents, and if so (2) when defendants so effectively asserted this defense as to cut off liability for royalties accruing thereafter.

## I.

A. Patent Invalidity as a Defense to Plaintiff's Claim for Royalties

1. Agreements Between the Parties

■ Plaintiff argues that the '74 and '75 Agreements are not ordinary license agreements because they are between co-owners of the patents. Defendants argue that the '75 Agreement is a license agreement, although acknowledging both agreements are between co-owners of the '566 and '271 patents.

Ordinarily a license agreement is a "written authority granted by the owner of a patent to another person empowering the latter to make or use the patented article for a limited period or in a limited territory." BLACK'S LAW DICTIONARY 829 (5th ed. 1979). Agreements between co-owners of patents do not fall in that category because it is statute law that a co-owner "may make, use or sell the patented invention without the consent of and without accounting to the other owners" unless there is an agreement to the contrary. 35 U.S.C. § 262 ("§ 262"). Accordingly, the '74 and '75 Agreements will be regarded as agreements between joint owners pursuant to § 262.

2. The Application of *Lear*

■ Plaintiff contends that where co-owners of a patent agree to share its proceeds, the agreement is enforceable regardless of the validity of the underlying patent. Defendants, relying upon *Lear, Inc. v. Adkins,* 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969), which overturned the doctrine of licensee estoppel, argue that if the underlying patent is invalid, a co-owner (like a licensee) is relieved of the obligation to account to his co-owner, despite an agreement to do so.

In *Lear* the Supreme Court held that a patent licensee may assert patent invalidity as a defense to a breach of contract action for nonpayment of royalties. Emphasizing the supremacy of federal patent policy, the Court held that licensees are not estopped (by having made license agreements, binding under state law, calling for the payment of royalties) from challenging the patent's validity and thus escaping payment of royalties. The Court stated that

[T]he equities of the licensor do not weigh very heavily when they are balanced against the important public interest in permitting full and free competition in the use of ideas which are in reality a part of the public domain. Licensees may often be the only individuals with enough economic incentive to challenge the patentability of an inventor's discovery. If they are muzzled, the public may continually be required to pay tribute to would-be monopolists without need or justification. We think it plain that the technical requirements of contract doctrine must give way before the demands of the public interest in the typical situation involving the negotiation of a license after a patent has issued.

*Id.* at 670–71, 89 S.Ct. at 1911.

Following the policy stated in *Lear,* courts have rejected a variety of estoppel arguments. *See e.g., Warner-Jenkinson Co. v. Allied Chemical Corp.,* 567 F.2d 184 (2d Cir.1977) (rejected settlement-agreement licensee estoppel); *Coastal Dynamics Corp. v. Symbolic Displays, Inc.,* 469 F.2d 79 (9th Cir.1972) (assignor estoppel calls for no different rule than licensee estoppel); *Beckman Instruments, Inc. v. Technical Development Corp.,* 433 F.2d 55 (7th Cir.1970) (rejected estoppel from marking patent number on product), *cert. denied,* 401 U.S. 976, 91 S.Ct. 1199, 28 L.Ed.2d 326 (1971); *Interconnect Planning Corp v. Feil,* 543 F.Supp. 610 (S.D.N.Y.1982) (rejected assignor-inventor estoppel when assignee sues assignor for infringement); *Clark Equip. Co. v. Keller,* 197 U.S.P.Q. 83, 88 (D.N.D.1976) (rejected judicial estoppel based on party's prior defense of patent it now attacks), *modified on other grounds,* 570 F.2d 778 (8th Cir.), *cert.*

*denied,* 439 U.S. 825, 99 S.Ct 96, 58 L.Ed.2d 118 (1978).

In light of these precedents, the circumstances of this case do not justify barring defendants' challenge to the '566 and '271 patents. While plaintiff claims that *Lear* relates only to ordinary license agreements and "has *not* been expanded to supercede the enforcement of § 262 joint-owner agreements under state contract law" (Plaintiff's Reply Memorandum, p. 5), *Lear* clearly held that removing the restraint on commerce caused by exercise of an invalid patent is more important than enforcing a promise between contracting parties. *Warner-Jenkinson,* 567 F.2d at 188. So, here, the doctrine of estoppel must give way to the federal policy of unencumbered challenges to patents believed to be invalid. The public interest in the validity of all outstanding patents allows scrutiny of the '566 and '271 patents, unconstrained by the contractual relationship between the parties. *See Interconnect,* 543 F.Supp. at 613.

■ Nor are defendants foreclosed from raising their invalidity defense because of either their assertions of the patents' validity in prior infringement suits, *see Clark, supra,*[4] or their alleged continuous "exploitation" of the patents. *See Warner-Jenkinson,* 567 F.2d at 188 (licensee may retain his license although attacking validity of licensor's patent).

Accordingly, the estoppel argument is rejected, and defendants may assert their defense of invalidity.

### B.   Liability Cut-Off Date

■ *Lear* also held that a licensee does not have to pay royalties while he is challenging the validity of the patent in court—

It seems to us that such a requirement would be inconsistent with the aims of federal patent policy. Enforcing this contractual provision would give the licensor an additional economic incentive to devise every conceivable dilatory tactic in an effort to postpone the day of final judicial reckoning. We can perceive no reason to encourage dilatory court tactics in this way. Moreover, the cost of prosecuting slow-moving trial proceedings and defending an inevitable appeal might well deter many licensees from attempting to prove patent invalidity in the courts.... Lastly, enforcing this contractual provision would undermine the strong federal policy favoring the full and free use of ideas in the public domain.

395 U.S. at 673–74, 89 S.Ct. at 1912–13.

Under *Lear,* liability for royalties is not terminated until whichever first occurs of two dates: (1) the date the licensee stops paying royalties, for the purpose of prompting an early adjudication of invalidity, *see Hull v. Brunswick Corp.,* 704 F.2d 1195, 1203–1204 (10th Cir.1983); *American Sterilizer Co. v. Sybron Corp.,* 614 F.2d 890, 897 (3d Cir.), *cert. denied,* 449 U.S. 825, 101 S.Ct. 88, 66 L.Ed.2d. 29 (1980); *PPG Industries, Inc. v. Westwood Chemical, Inc.,* 530 F.2d 700, 701, 708 (6th Cir.), *cert. denied,* 429 U.S. 824, 97 S.Ct 76, 50 L.Ed.2d 86 (1976), or (2) the date the licensee files suit (or a counterclaim) attacking the patent's validity. *See e.g., PPG Industries,* 530 F.2d at 708. This rule protects a principle underlying the *Lear* decision: it fosters early adjudication of patent invalidity. As the Tenth Circuit explained:

If licensees are permitted to suspend royalty payments without notifying licensors that the reason for the suspension is to question the validity of the patents, they will be subject to a similar temptation to forestall validity litigation. Licensees might draw licensors into protracted negotiation of other contract issues while continuing to use the patents under the licenses. The longer they could stall validity litigation, the greater the amount of royalties they could avoid while still enjoying the monopoly benefits conferred by the license. Permitting licensees to avoid royalties that they suspended for reasons other than to challenge validity would give the licensees

---

**4.** Plaintiff argues that *Clark's* holding rested on the license agreement's clause permitting the licensee to challenge the patent's validity.

Nevertheless, the court stated that it declined to apply judicial estoppel because of the *Lear* decision.  (197 U.S.P.Q. at 88.)

"additional economic incentive to devise every conceivable dilatory tactic in an effort to postpone the day of final judicial reckoning." *Id.* [*Lear*], 395 U.S. at 673, 89 S.Ct. at 1912. Limiting the royalties licensees can avoid to those accruing after the licensees effectively notify the licensors that they question the validity of the licensed patents prevents the rule in *Lear* from being used to frustrate the policies enunciated there.

*Hull,* 704 F.2d at 1203–04.

Under the facts and circumstances of this case, defendants' liability terminated (assuming patent invalidity) on October 17, 1985, when they filed their answer to the second amended complaint. Prior to that time, there was no challenge "of the type to prompt an early adjudication of invalidity." *PPG, Industries,* 530 F.2d at 706, *see also Foster Wheeler Corp. v. Babcock & Wilcox Co.,* 440 F.Supp. 897, 900 (S.D.N.Y. 1977), since the earlier pleadings did not place validity in issue.[5]

Defendants argue that for the purpose of determining a liability cut-off date their 1985 answer should relate back to their 1979 pleadings pursuant to Fed.R.Civ.P. 15(c). Plaintiff contends that the relation-back rule is inapplicable, and further that pursuant to Fed.R.Civ.P. 8(c) and 13(a) and 35 U.S.C. § 282(2) defendants waived their defenses and counterclaims of invalidity by failing to plead them in their original answer.

▮ Plaintiff's waiver argument is without merit. The Federal Rules of Civil Procedure are to be liberally construed to effectuate the general purpose of resolving cases on the merits and to dispense with technical procedural problems. *Staren v. American National Bank & Trust Co.,* 529 F.2d 1257, 1263 (7th Cir.1976). Moreover, a court has discretion to allow an omitted counterclaim or defense at any time "when justice so requires." Fed.R. Civ.P. 15(a), *see Deutsch v. Health Insurance Plan of Greater New York,* 573 F.Supp. 1443, 1446 (S.D.N.Y.1983). The sound exercise of this discretion usually involves the presence or absence of such factors as undue delay, bad faith, undue prejudice to opposing party, or futility of amendment. *Browning Debenture Holders' Committee v. DASA Corp.,* 560 F.2d 1078, 1086 (2d Cir.1977). Here, where plaintiff apparently made no objections to the defenses and counterclaims at the time the 1985 answer was filed and has presented only conclusory statements of prejudice, defendants' invalidity defenses and counterclaims will stand.[6]

▮ Plaintiff is correct that the relation-back rule is inapplicable here. Fed.R. Civ.P. 15(c) provides:

**Relation Back of Amendments.** Whenever the claim or defense asserted in the

---

**5.** Although plaintiff originally alleged infringement, the defendants' refusal to account to plaintiff was based on a contractual dispute and not an assertion of invalidity of the patents. While defendants assert that they challenged the patents' validity by claiming that they were "not duly and legally issued because of improper inventorship" (Defendants' Exh. Q, ¶¶ 13, 14), they at the same time sought correction of that alleged error pursuant to 35 U.S.C. § 256 (*Id.* ¶¶ 29–35), which provides that:

The error of omitting inventors or naming persons who are not inventors shall not invalidate the patent in which such error occurred if it can be corrected as provided in this section.

Further, defendants' insertion of the word "valid" before "claims" in paragraph 17 of their 1979 answer did not challenge the validity of the '566 and '271 patents, in light of their 1981 response to Interrogatory No. 17: "Defendants contend that the patents are invalid for improper inventorship, until corrected, pursuant to 35

U.S.C. § 256." (Raymond Aff., sworn to May 9, 1986, Exh. A).

**6.** Plaintiff's reliance upon *Ross v. United States,* 574 F.Supp. 536 (S.D.N.Y.1983) is misplaced because *Ross* was decided pursuant to Fed.R. Civ.P. 12(h) (Waiver or Preservation of Certain Defenses). Patent invalidity is not a defense listed in Rule 12(h) nor does 35 U.S.C. § 282(2) (which states that invalidity must be pleaded) contain a provision similar to Rule 12(h). *See* 35 U.S.C. § 282(2). Moreover, *Trio Process Corp. v. L. Goldstein's Sons, Inc.,* 461 F.2d 66 (3rd Cir.), *cert. denied,* 409 U.S. 997, 93 S.Ct. 319, 34 L.Ed.2d 262 (1972) does not support plaintiff's proposition that failure to raise an affirmative defense in an original answer bars a later pleading of that defense—the court in *Trio* refused to permit a particular defense because it was raised for the first time on appeal. *See id.* at 74.

amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading. Typically the doctrine of relation-back is applied when the statute of limitations is raised to bar an amendment or counterclaim. *See* 3 J. Moore, W. Taggart & J. Wicker, Moore's Federal Practice ¶ 15.15[5] (2d ed. 1985). While relation-back has also been applied in other contexts, none of them involved the issue presented here. *See ibid.* Relation-back here would frustrate the policy underlying *Lear*, which is to foster early presentation of issues of patent validity—for it would artificially provide the later assertion of invalidity with the same economic benefit as the early assertion. Accordingly, the relation-back rule will not be applied to defendants' invalidity defenses and counterclaims.[7] *Cf. United States v. Stromberg*, 227 F.2d 903, 906 (5th Cir.1955).

In conclusion, if the patents are invalid, defendants will be relieved of any obligation to plaintiff for royalties based on Synergistics' manufacture and sale of products covered by the '566 and '271 patents as of October 17, 1985.

## II

■ A court can declare a patent invalid on a summary judgment motion where no material issue of fact is presented and the facts require a holding of invalidity. *See Petersen Mfg. Co. v. Central Purchasing, Inc.*, 740 F.2d 1541, 1546 (Fed.Cir.1984); *Barmag Barmer Maschinenfabrik v. Murata Mach. Ltd.*, 731 F.2d 831, 835 (Fed. Cir.1984); *Union Carbide Corp. v. American Can Co.*, 724 F.2d 1567, 1571 (Fed.Cir. 1984); *Chore-Time Equip. Co. v. Cumberland Corp.*, 713 F.2d 774, 778 (Fed.Cir. 1983). A patent is presumed valid, 35 U.S.C. § 282, and thus the facts leading to

a conclusion of invalidity must be established by clear and convincing evidence. *Jamesbury Corp. v. Litton Indus. Products, Inc.*, 756 F.2d 1556, 1559 (Fed.Cir. 1985); *American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1360 (Fed.Cir.), *cert. denied*, 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984); *Lindemann Maschinenfabrik v. American Hoist & Derrick Co.*, 730 F.2d 1452, 1459 (Fed.Cir. 1984).

### A. The '566 Patent

■ The '566 patent, entitled "Adhesive Surface Dart and Shock Absorbing Target," describes an improved velcro dart game. A "primary object of this invention [is] to provide new and improved structures in target games employing targets and missiles having surface engagement elements which hook together." (Defendants' Exh. D. col. 1, lines 43–46.) The essence of the '566 patent is the "construction of the wall mounted target which allowed it to deflect on impact, but without the deflected portion touching the wall" (Lemelson Aff., sworn to April 3, 1986, ¶ 58); at the instant the missile strikes the target, the target surface yields and flexes slightly, allowing the velcro components to engage each other and preventing the missile from merely bouncing off the target. (*Id.* ¶ 57.) The '566 patent, issued on December 31, 1974, contains independent claim 1 and dependent claims 2–5. (Defendants' Exh. D.)

Defendants argue that claims 1, 2 and 4 are invalid because they are anticipated by prior art, which includes Patent No. 3,601,-406 issued to A. Giusti ("Giusti patent").

An invention is not patentable if it lacks novelty. Thus, under 35 U.S.C. § 102 a patent may not be obtained if the claimed invention is anticipated by prior art. Section 102 provides in pertinent part:

A person shall be entitled to a patent unless—

---

7. Contrary to defendants' assertion, *PPG Industries, supra*, does not support their proposition that their invalidity defenses and counterclaims should relate back to the date of the filing of their original answer. In *PPG Industries*, the court found that an amended complaint asserting patent invalidity related back to the filing date of the original complaint because the filing of the complaint itself "encouraged an early adjudication of invalidity." 530 F.2d at 708. Here, defendants' original answer did not prompt an early adjudication of patent invalidity for the reasons discussed above.

(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, ...

Anticipation means "the disclosure in the prior art of a thing substantially identical with the claimed invention." E. Lipscomb, Walker on Patents, § 4.4 (3d Ed.1984). In determining whether a patent has been anticipated by an earlier patent, "the question is not what is the precise scope of the claims of an earlier patent but what is disclosed and made known to the world." *Ibid.* "Anticipation is established only when a single prior art reference discloses, expressly or under principles of inherency, each and every element of a claimed invention." *RCA Corp. v. Applied Digital Data Systems, Inc.,* 730 F.2d 1440, 1444 (Fed.Cir.), *cert. denied,* 468 U.S. 1228, 105 S.Ct 32, 82 L.Ed.2d 923 (1984).

The Giusti patent (Defendants' Exh. X), issued on August 24, 1971 (more than one year prior to the January 24, 1974 filing of the '566 patent), is prior art against the '566 patent. *See* 35 U.S.C. § 102(b). Entitled "Golf-Practicing Apparatus," the Giusti patent discloses a target suspended from a wall by a hook and a "self-adhering" golf ball. The target, illustrated in Figures 1, 2 & 3 of the patent, is described as follows:

... a panel of fabric material is suspended from its top in substantially upright position by any suitable means, and it may be placed inside a home, against a building or located in any selected location. For this purpose, a hem has been shown in FIGS. 1 and 2 for receiving a polelike rod, and eyelets have been secured to this rod. Moreover, hooks may be secured to a wall and these hooks engaged with the eyelets. Of course, any suitable frame may be used to constitute a support for the panel.

Moreover, a lower hem is provided at the bottom of the panel and it has a rod confined in this hem, thus holding the panel taut. However, the panel is free to flex when a golf ball is driven thereagainst, and for this reason the panel is spaced forwardly of the wall.

(Defendants' Exh. X, col. 1, lines 47–54) (omitting internal references).

The Giusti patent discloses, expressly or under principles of inherency, every element of the '566 target, including unchallenged dependent claims 3 and 5. Accordingly, the Giusti patent fully anticipates the '566 patent, which is declared invalid.

### B. The '271 Patent

The '271 patent, entitled "Ball for Target Games," discloses a missile which is partially covered with evenly spaced, oblong velcro strips. (Defendants' Physical Exh. No. 2; Exh. G, Figs. 1, 3.) To prevent peeling, the strips are placed within oblong indentations molded in the missile's surface. "The depth of each indentation is preferably such that the upstanding hook-like formations of the material inserted therein will protrude just beyond the adjacent surface portions of the missile so that a minimum discontinuity in the surface of the hollow spheroid is effected." (Defendants' Exh. G, Abstract.) Further

The instant invention is particularly directed to a new and improved structure in a missile such as a spheroid of the type described above, wherein substantially half of the hooking material required of the conventional totally covered spereoid [sic] is eliminated thereby substantially reducing the cost for producing same. The ball shaped missile is light enough in weight and is covered with separate sections of hooking material which are so configured and spaced apart around the surface of the missile that the missile will attach itself to the surface of the pile target regardless of which portion of the missile strikes the target.

(*Id.,* col. 1, lines 36–47.) The '271 patent, issued on November 4, 1975, contains independent claim 1 and dependent claims 2–8. (Defendants' Exh. G.)

Defendants assert that the '271 patent is invalid as obvious to one having ordinary skill in the art. Obviousness, as a base for invalidity, is set forth in 35 U.S.C. § 103:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

Defendants contend that three prior patents make the '271 patent obvious:

### 1) The Lemelson '345 Patent

The Lemelson '345 patent, which discloses plaintiff's original velcro dart game, was declared invalid for obviousness in *Centsable Products, Inv. v. Lemelson*, 75 Civ. 3717 (N.D.Ill. June 12, 1978), *aff'd*, 591 F.2d 400 (7th Cir.), *cert. denied*, 444 U.S. 840, 100 S.Ct. 79, 62 S.Ed.2d 52 (1979). Figure 5 and claim 6 of the patent disclose a ball-shaped missile covered with circular patches of velcro material (Defendants' Exh. B, Figure 5). The patent states that:

Said circular patches may be replaced with one or more patches of hooking material of other contour such as a strip extending partly or completely around the sphere as a belt. Whereas the hooking material may be provided in a manner to cover the entire spherical surface, the provision of it on a limited area or areas of said surface may enhance the play value of the missle [sic] since it must not only strike the hooking material of the target but must do so with the patch engaged between the base and the target hooking material in order for said ball to be engaged and held on said target.

(*Id.*, col. 4, lines 21–32) (internal references omitted) The '345 patent was cited as a reference in the '271 patent. (Defendants' Exh. G, References Cited).

### 2) The Giusti Patent

The Giusti patent (Defendants' Exh. X), discussed above under anticipation, discloses in Figure 4 and Claim 1(d) a golf ball which has two equilateral strips of velcro material glued to the ball's surface. (Defendants' Physical Exh. 1; Exh. X, Fig. 4). Specifically, claim 1(d) discloses:

... a self-adhering golf ball provided with a plurality of hooks on its surface that will interengage with and cling to the fabrics of the panel and green, when the ball is propelled thereagainst by a golfer from a position on a driving range located in front of the panel, with the hooks holding the golf ball at the location where it strikes the panel or green.

(Defendants' Exh. X, col. 3, lines 43–49). The Giusti patent was not cited as a reference in the '271 patent. (Defendants' Exh. G, References Cited).

### 3) The Mates, et al. Patent ("the Mates Patent")

In 1968, Jack K. Mates obtained a patent entitled "Fastening Device." (Defendants' Exh. Z). The invention "relates to a fastening device for releasably securing an instrument to a supporting surface." (*Id.*, col. 1, lines 21–23). The patented invention consists of a velcro strip, which attaches to a supporting surface, and an adaptor ring, whose outer surface is covered with velcro, which is placed on the instrument to be fastened. The adaptor ring, as depicted in Figures 2 through 6, is a "C-shaped cross-sectional configuration" (*Id.*, col. 3, lines 2–3) whose outer surface contains upper and lower rims ("flanges"). Further, "the portions of the outer surface adjacent the co-planar surfaces are provided with shoulders." (*Id.*, col. 3, lines 30–32) (omitting internal references).

The purpose of the rims and shoulders "is to define an annular channel in which the tape can be placed to prevent the marginal edges of the tape from being peeled away from the outer surface." (*Id.*, col. 3, lines 32–35)(omitting internal references). Moreover, the rims are "of a height less than the height of the hooking elements." (*Id.*, col. 3, lines 28–30). The Mates patent was not cited as a reference in the '271 patent. (Defendants' Exh. G, References Cited).

While the ultimate question of patent validity is one of law, *Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966), a determination of obviousness "lends itself to several basic factual inquiries." *Ibid.* Under the standard set forth in *Graham,*

> the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined.

*Ibid.*

Prior art must be viewed without the benefit of hindsight afforded by the claimed invention. *Hodosh v. Block Drug Co.*, 786 F.2d 1136, 1143 n. 5 (Fed.Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 106, 93 L.Ed.2d 55 (1986). Further, when a claimed invention is a combination of features previously used in two separate inventions, "[t]he claimed invention must be considered as a whole, and the question is whether there is something in the prior art as a whole to suggest the desirability, and thus the obviousness, of making the combination." *Lindemann,* 730 F.2d at 1462.

No material facts are in dispute. Defendants have adopted plaintiff's standard of ordinary skill in the art—"a designer of target games with some experience in the application of Velcro material." (Lemelson Aff., ¶ 65 n. 5.) The scope and content of the prior art has been determined above. While plaintiff argues that the Mates patent permits the lateral edges of the velcro strip to peel up, the patent explicitly discloses that the function of the adaptor ring's shoulders is to prevent the "marginal edges," *i.e.,* the lateral edges, of the tape from peeling away. (*See* Defendants' Exh. Z, col. 3, lines 32–35).

Further it is undisputed that the differences between the '271 patent and the '375 and Giusti patents are (1) the '271 patent provides indentations to prevent displacement of the velcro strips and the depth of the indentations do not prevent the ball from sticking to the target and (2) the '271 patent spaces the oblong velcro strips from one another in such a way that the ball will always stick to the target. (*See* Lemelson Aff., ¶ 75; Defendants' Memorandum, p. 26).

Viewing the '271 patent in the context of the prior art, it is the court's conclusion that the '271 patent is invalid pursuant to 35 U.S.C. § 103. "The gap between the prior art and [the '271 patent] is simply not so great as to render the ['271 invention] nonobvious to one reasonably skilled in the art." *Dann v. Johnston,* 425 U.S. 219, 230, 96 S.Ct. 1393, 1399, 47 L.Ed.2d 692 (1976) (footnote omitted).

The Mates patent discloses a channel, bordered by upper and lower rims and two shoulders, where velcro material is placed. This channel prevents all marginal edges of the velcro material from peeling up. Thus, it would have been obvious to a designer of target games with some experience in the application of velcro material to mold the target balls of the Giusti or '345 patents with indentations to prevent the velcro strips from peeling up. *See Lindemann,* 730 F.2d at 1462 ("question is whether there is something in the prior art as a whole to suggest the desirability, and thus the obviousness, of making the combination"); Mates Aff., ¶ 9 ("Since at least the early 1960's Velcro Corporation has recommended to its customers various approaches for dealing with the peeling problem. One such recommendation was to mount the tape in indentations or recesses in the surface of the substrate"). Further, sticking the strips in the indentation so that the velcro hooks extend outwardly beyond the ball's surface is an obvious combination because the Mates patent discloses that the hooking elements should be of a height greater than the upper and lower rims.

Finally, the spacing and shape of the velcro strips are no more than logical and obvious steps toward ensuring that the missile will always stick to the target at a lesser cost than completely covering the ball with velcro. The configuration disclosed in the '271 patent does not accomplish a new or unexpected result, though it may be of economic value. It is well set-

tled that more than mere change of form or rearrangement of parts is necessary for patentability. *Span-Deck, Inv. v. Fab-Con, Inc.,* 677 F.2d 1237, 1244 (8th Cir.) (citing cases), *cert. denied,* 459 U.S. 981, 103 S.Ct. 318, 74 L.Ed.2d 294 (1982); *Sheldon Friedlich Marketing v. Carol Wright Sales,* 219 U.S.P.Q. 883, 888 (S.D.N.Y. 1983).

Accordingly, the '271 patent is invalid for obviousness.

## CONCLUSION

Defendants are relieved of any liability to plaintiff arising from Synergistics' manufacture and sale of products covered by the '566 and '271 patents as of October 17, 1985.

Plaintiff's motion to strike defendants' affirmative defenses and counterclaims based on the invalidity of the '566 and '271 patents is denied.

A status conference will be held on November 6, 1987 at 2:40 p.m. in Courtroom 35.